## AFFIDAVIT OF TASK FORCE OFFICER MARTIN M. O'MALLEY

I, Task Force Officer Martin M. O'Malley depose and state as follows:

### INTRODUCTION

1.     I am an "investigative or law enforcement officer of the United States" within the
meaning of Section 2510 (7) of Title 18, United States Code, that is an officer of the United
States who is empowered by law to conduct investigations of, and to make arrests for, offenses
enumerated in Section 2516, Title 18, United States Code. I have been employed as a Task
Force Officer of the Federal Bureau of Investigations since February 29, 2012. I am currently
assigned to the Boston Office of the New England Field Division.

2.     I had served as a police officer in Boston, Massachusetts for nine years before I was
promoted to the rank of detective. I served as a detective in the Special Investigations Unit for
five years. In February 2012, I was sworn in as Task Force Officer and began working with the
Federal Bureau of Investigations Group C-2, Boston Office of the New England Field Division.

3.     During the course of my law enforcement career, I have written and/or participated in the
execution of numerous search warrants. In a substantial number of residential and storage
location searches executed in connection with the drug investigations in which I have been
involved, the following kinds of drug-related evidence have typically been recovered: (a)
controlled substances, such as cocaine, cocaine base, marijuana and heroin; (b) paraphernalia for
packaging, processing, diluting, weighing, and distributing controlled substances; (c) books,
records, receipts, notes, ledgers, and other papers relating to the distribution of controlled
substances; (d) personal books and papers reflecting names, addresses, telephone numbers, and
other contact or identification data relating to individuals involved in the distribution of
controlled substances; (e) cash, currency, and records relating to controlled substances income

and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, and checkbooks; (f) specially manufactured hidden compartments known as "hides" that are used to store drugs and drug proceeds and which are at times electronically controlled and operated; and (g) firearms and other dangerous weapons.

4.      In addition, during the course of such residential and storage location searches, I and other agents have also found items of personal property that tend to identify the person(s) in premises. Such identification evidence is typical of the articles people commonly maintain in their residences and storage locations, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

5.      Based upon my training and experience, as well as the knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences, basements, and storage locations. Further, it is generally a common practice for drug traffickers to maintain in their residences and/or storage locations records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances, from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also typically be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers

must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to conduct their drug trafficking business efficiently.

6.      It is also a generally common practice for traffickers to conceal at their residences, basements, and storage locations large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or storage locations.

7.      My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described in the training and qualifications portion of this affidavit; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, more particularly described below; (c) from this particular investigation and other investigations involving the interception of wire communications pursuant to court authorized Title III wiretaps.

8.      I submit this affidavit in support of applications for search warrants for the following locations:

> **(a) 252 Kennedy Drive, Apartment #605, Malden, MA;**
>
> **(b) 40 Langdon Street, Apartment, #1, Roxbury, MA;**

(c) **500 Broadway Street, Apartment #3161, Malden, MA;**

(d) **220 Pearl Street, Apartment #2, Somerville, MA;**

(e) **855 American Legion Highway, Apartment #3C, Roslindale MA;**

(f) **91 Barton Road, Wellesley Hills, Massachusetts**

(g) **567 Massachusetts Avenue, Apartment A, Boston, MA;**

(h) **23 Harold Street, Apartment #2, Roxbury, MA;**

(i) **83 Nelson Street, Apartment #1, Mattapan, MA; and**

(j) **22 Armandine Street, Apartment #1, Dorchester, MA**

(collectively, the "Target Premises") more fully described below, with photographs of each premises attached as Exhibits 1 (a) through (j).

9.　　As described below, the investigation has shown that the Target Premises are the residences of and/or cocaine, crack cocaine, marijuana, oxycodone, and drug proceeds, storage locations used by, Jonathan DASILVA, Alexis HIDALGO, Moises FIGUEROA, John WEBBE, Victor SCOTT, Jerry CORREIA, and Jose DENIS (collectively, the "Target Subjects"), all of whom were the targets of an ongoing Federal Wiretap Title III investigation and who were indicted in the United States District Court for the District of Massachusetts on January 16, 2013. Each Target Subjects is charged with one Count of conspiracy to distribute more than 280 grams of cocaine base, more than 500 grams of cocaine, more than 100 kilograms of marijuana and oxycodone in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and (b)(1)(B).

10.　　I have personally participated in the investigation of the subjects named in this Affidavit since August 2011. Prior to August 2011, I had a familiarity with the subjects through professional interactions. My familiarity of this group has allowed me to be designated an expert in State Court proceedings where I have been allowed to testify about the identity of the street

gangs that are the subject of this investigation, more specifically, the Hendry Street gang and the Woodward Avenue street gang. I am familiar with the facts and circumstances of this investigation not only from my own personal participation in the investigation, but also from oral and written reports made to me by other Agents of the Federal Bureau of Investigations, other federal, state and local law enforcement agencies, and a review of transcripts of court-ordered intercepted conversations and summaries of such wiretap interceptions.

11.     I submit that there is probable cause to believe that among other things, cocaine, crack cocaine, marijuana, oxycodone, drug packaging including, but not limited to plastic bags, drug paraphernalia, drug scales, U.S. currency, bank statements, communication devices, all ledgers, and documents reflecting the occupancy of the following residences, including but not limited to personal mail, checkbooks, identification, correspondence, utility bills, keys, photographs, vehicle registration information in the name of Jonathan DASILVA, Alexis HIDALGO, Moises FIGUEROA, John WEBBE, Victor SCOTT, Jerry CORREIA, and Jose DENIS (The Targets), and other evidence of violations of 21 U.S.C. §§ 846 and 841(b)(1)(A) and (b)(1)(B). I request the authority to search basement areas, any safes, lock boxes, or containers whether they are locked or unlocked. I also request the authority to search any and all spaces that the Target Subjects have control over associated with the Target Premises.

12.     The affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause for the search of the Target Premises for the items described herein.

## II.     DESCRIPTION OF TARGET PREMISES

13.     I have observed each of the target premises, and have spoken with the agents who have observed the Target Premises, to provide the following descriptions:

(a)     <u>252 Kennedy Drive, Apartment #605, Malden, MA, 02148</u>

**252 Kennedy Drive, Apartment #605, Malden, MA** is a brick multi-family, apartment building, located inside of the Granada Highlands housing development. **252 Kennedy Drive** is located in the rear, left corner of the apartment complex grounds. **252 Kennedy Drive** is an eight-story, light tan, brick apartment building. The exterior entry door is made of a brown metal and glass. There is brick awning above these doors that has the numbers **252** on it. **Apartment #605** is located on floor number six (6). The door for that apartment is a tan, wooden door with a gold colored peephole located at the top, middle of the door. There is a gold doorknob and deadbolt located on the right side of the door.  The numbers **"605"** are written on the doorknocker in black numbers.

Surveillance observations throughout the investigation have shown that Jonathan DASILVA resides at **252 Kennedy Drive, Apartment #605.**

(b)     <u>40 Langdon Street, Apartment #1, Roxbury, MA, 02119</u>

**40 Langdon Street, Roxbury** is a duplex-style, multi-family home that is connected to 42 Langdon Street, Roxbury. This building has white aluminum siding and has ten (10) cement stairs that lead up to the front porch. The front, exterior, door is a blue aluminum door which has a glass window located at the top, middle of the door. The numbers four (4) zero (0) are located are located above this door. These numbers are black in color. There is a silver colored chain-linked fence that starts to the left of the front stairs, if you were looking at the building from the sidewalk located in front of **40 Langdon Street, Roxbury** that runs to the property line next door. This fence has two (2) gates: one that leads to the yard and the second that leads to a basement door. The basement door is made of aluminum, and is white in color. **Apartment #1** is the only apartment located on the first floor.  Clarimundo DASILVA (Jonathan DASILVA'S

father), Joanna DASILVA (Jonathan DASILVA'S mother), Justin DASILVA (Jonathan DASILVA'S brother) and Marcus DASILVA (Jonathan DASILVA'S brother) reside at **40 Langdon Street, Apartment #1, Roxbury.**

Surveillance units have made observations of controlled purchases of marijuana from Jonathan DASILVA at this address throughout the investigation.

**(c)  500 Broadway Street, Apartment #3161, Malden, MA, 02148**

**500 Broadway Street, apartment #3161, Malden,** is located in Cliffside Commons' apartment development. The building is a five-story apartment building. The building is white and brown in color. There is one entryway into the apartment grounds, which is accessible from Broadway Street. The entryway has a large blue and white sign that has the numbers "**500**" and "Cliffside Commons" written in white. The interior, apartment door is white in color and has a gold colored peephole at eye level. There is a deadbolt lock and a gold colored door handle located on the right side of the door. The numbers "**3161**" are located to the right of this door. Throughout the investigation surveillance observations and phone calls have revealed that HIDALGO resides at **500 Broadway Street, Apartment #3161, Malden, MA**.

Surveillance units have observed HIDALGO at this address throughout the investigation.

**(d)  220 Pearl Street, Apartment #2, Somerville, MA, 02145**

**220 Pearl Street, Somerville** is described as a three-story structure, which has a brick exterior on the first floor, with gray siding on floors two (2) and three (3). There are two windows located in the front of floor number one (1). There is a driveway to the left of the building if you were looking at the building from the sidewalk in front of the residence. The front exterior, door is located at the top a flight of exterior stairs on the left-hand side of the landing. This doorway gives access to a common hallway on the interior of the building. Once inside,

Apartment #2 is located on the second floor of the building and is the only apartment on that floor. Access to **Apartment #2** is gained by walking up one flight of stairs and turning to your right. The door, which is the only door on floor #2 of the common front hallway, is white in color with a semi-circle window on the top of it.

Throughout the investigation HIDALGO'S intercepted electronic communications and surveillance have shown that HIDALGO stores money at **220 Pearl Street, Apartment #2, Somerville, Massachusetts**.

### (e) 855 American Legion Highway, Apartment 3C, Roslindale, MA 02131

**855 American Legion Highway, Apartment three (3) C** is located in a six-story brick apartment complex, the Cummins Towers in Roslindale, Massachusetts. The entrance to this building has a green colored awning with the number **eight (8) five (5) five (5)** on it. These numbers are white in color. The front, entrance doors are made of silvered colored metal and glass. There are cement stairs that lead you down to the exterior, entry doors. There are black cast iron railings that abut these stairs. The exterior, entry doors are made of a silver colored metal and glass. There is a sign to the left of the doors that says Private Property, No Trespassing. Apartment **3C** is located on the third floor of the building and the door to the apartment is marked with "**3C**."

### (f) 91 Barton Road, Wellesley Hills, MA

**91 Barton Road, Wellesley Hills, MA is** described as a one story, single family residence that is attached to several additional residences comprising a row-style building structure. The entire structure displays a brown siding exterior with white trim and dark roofing shingles, and the dwelling at **91 Barton Road** displays the numbers "**91**" above the door, has a white metal or vinyl storm-door, and brown wooden main door.

**(g)**     <u>**567 Massachusetts Avenue, Apartment A, Boston, MA, 02118**</u>

**567 Massachusetts Avenue, Apartment A,** is located in a brick, four-story apartment building. There are ten (10) cement stairs that lead the front with black railings on each side of the staircase. These stairs lead up to the exterior doors of this building. The two, front, exterior doors are made of wood and are dark brown in color. There is a handle, gold in color, located on the right door. There is a long, rectangular, glass window on each of these doors. Located at the bottom of each door is a piece of gold colored metal. The numbers **five (5) six (6) seven (7)** are located below the window on the left door. These numbers are gold in color. **Apartment A** is located in the basement level of **567 Massachusetts Avenue.** The door to this apartment is made of wood and is light brown in color. This door has the letter "**A**" located in the middle, near the top of this door. This letter "**A**" is gold in color. This door also has two dead bolt locks located on the right side of this door. These locks, as well as, the door handle are gold in color.

**(h)**     <u>**23 Harold Street, Apartment #2, Roxbury, MA 02119**</u>

**23 Harold Street, Roxbury** is a light brown brick, three-story building. There are six cement stairs that lead up to two, front, exterior doors. There are black, iron railings located on the staircase. The front, exterior doors are brown in color and both have the numbers **twenty-three (23)**, which are gold in color located near the top, center, of each door. The exterior, entry door for the common hallway that leads to **Apartment #2** is the door, which is located on the right side of the front exterior landing, if you were looking at the front, exterior doors, from the sidewalk. There is a row of gold mailboxes located to the left of these doors. The name DANCY is written on the middle mailbox. The interior door, which allows access to **Apartment #2,** is

located on the second floor of the common hallway, and is a wooden door, which is painted brown. There is a small sign which is located at eye level of this door, which says "Home rules".

### (i)      83 Nelson Street, apartment #1, Dorchester, MA, 02124

**83 Nelson Street, Dorchester** is a traditional three-family style home, which is brown in color. There are three front porches that are made of wood. There are six stairs that lead to the front porch landing. The front, exterior door is brown and made of wood. There is a gold colored plate at the bottom of this door. There are silver mailboxes to the right of this door. There is a no trespassing notice located above the mailboxes. **Apartment #1** is located on the first floor and is the only apartment on the first floor.

### (j)      22 Armandine Street, apartment #1, Dorchester, MA 02124

**22 Armandine Street, Apartment #1, Dorchester, MA** is a two and one-half style structure with yellow siding. There is a cement walkway that leads to the staircase. This staircase has six stairs that lead to the front porch. The front exterior door is made of metal and is white in color. There is a chain-linked that abuts the sidewalk. The majority of this fence is covered with shrubs. **Apartment #1** is the only apartment located on the first floor of the building.

## III      BACKGROUND OF THE INVESTIGATION

14.      In July 2010 a confidential informant (CI) provided information to Special Agents with Department of Homeland Security, Homeland Security Investigation (HSI) concerning criminal activity being undertaken by members of a street gang based in Roxbury and Dorchester, Massachusetts. The CI referred to the area in which this group was most active as "Purple City", and the area encompassed the streets within Dudley Avenue and Norfolk Avenue, and Magazine Street and East Cottage Street. The CI identified numerous individuals whom the CI claimed were members of this group, and these subjects, were alleged to be engaged in drug and firearm

trafficking, and violent feuds with rival groups in close proximity to their neighborhood. Specifically, the CI claimed that Jonathan DASILVA and John Alves were heading a marijuana trafficking enterprise that was centered on Woodward Avenue in Roxbury. Additionally, Alexis HIDALGO was the head of a cocaine trafficking business that was based on Hendry Street in Dorchester, Massachusetts. More specifically regarding HIDALGO, the CI reported that he utilized a house on Hendry Street from which to conduct cocaine distribution activity. In addition to drug supplies in the second floor apartment, HIDALGO was reportedly keeping firearms inside of this residence in the first floor apartment. Lastly, these two groups were alleged to be associated with each other.

15.     Based upon this information, in July 2010 Special Agents with the Federal Bureau of Investigation (FBI) and HSI initiated controlled drug purchases with the CI in an effort to determine the veracity of some of the allegations. These controlled purchases were limited to small quantities of marijuana. These operations occurred through the Summer of 2010, and resulted in evidence of marijuana trafficking being conducted by John Alves, and an additional subject previously identified by the CI, Ilton CORREIA. Ultimately, the CI ceased cooperation with law enforcement, and proactive operations with a cooperating source ceased for a time.

16.     In July 2011, a cooperating witness (CW) provided information to Special Agents with HIS, which corroborated and surpassed that which was provided by the CI. According to the CW, Jonathan DASILVA had returned from Atlanta, Georgia, and was controlling drug trafficking activity on Woodward Avenue. HIDALGO was continuing to direct cocaine trafficking operations from 37 Hendry Street, 2nd floor apartment, and DASILVA and HIDALGO had enlisted several associates to support their businesses by handling drugs transactions on their behalf.

17.     In August 2011, Detectives and Officers with the Boston Police Department, Special

Agents with the FBI, and HSI began to conduct controlled drug purchases with the CW from

identified subjects of the investigation, who were reported to be engaged in drug trafficking

activity on Woodward Avenue and Hendry Street. These operations, which were recorded

wherever possible with audio and video recording equipment resulted in evidence of marijuana

and cocaine distribution being undertaken by DASILVA and HIDALGO respectively, as well as

several associates who participated in these transactions as drug preparers/packagers,

transporters and distributors.   These controlled drug purchase were conducted from August 2011

through October 2012, and corroborated information previously gathered regarding the following

subjects with respect to allegations of drug trafficking activity: Alexis HIDALGO, Jonathan

DASILVA, John WEBBE, Victor SCOTT, Moises FIGUEROA, Hamilton Lopes, Nicholas

Otey, Jerry CORREIA, John Alves, Ilton Correia, Anthony Dasilva, Marcus Dasilva, and Joshua

Brandao. A number of these controlled purchases were made at 37 Hendry Street, Dorchester.

The house at 37 Hendry Street (where targets VICTOR SCOTT, JOHN WEBBE, and ALEXIS

HIDALGO) conducted drug deals for much of this investigation) was an address associated with

so much drug activity and gun violence, at the direction of Mayor's Office, in response to a high

volume of complaints, BPD stationed a marked cruiser on the street, 24 hours a day. Despite the

presence of a marked police cruiser the targets in this case continued to operate a thriving drug

distribution business out of 37 Hendry Street. In addition to selling drugs from this location

VICTOR SCOTT AND JOHN WEBBE also resided at this address. 37 Hendry Street was shut

down in late August, 2012 for building code violations after Inspectors from the Boston

Inspectional Services Department (ISD) were finally able to enter the building. As a result of 37

Hendry Street being shut down VICTOR SCOTT and JOHN WEBBE were displaced and

eventually began living at their current residences. These individuals and their co-conspirators then began to use 36 Woodward Avenue, Roxbury as a location from which to distribute narcotics. On December 01, 2012 officers responded to 36 Woodward Avenue for a call of "Shots fired". As a result of this call officers conducted a protective sweep of this residence and located multiple firearms, marijuana, tablets believed to be oxycodone, and drug packaging materials. As a result of this discovery the targets then deemed 36 Woodward Avenue "Hot" and moved their drug distribution network from this location to conducting in person deliveries. The conduct of the investigation in this manner failed to provide investigators with details of the inner workings of this group. Interviews conducted with the aforementioned CI and CW, as well as additional CI's known to the Boston Police Department indicated an organization whose members worked in concert as it related to criminal activity, specifically with regard to drug trafficking. Therefore, alternate investigative techniques were pursued in an effort to gather these details and either confirm or refute the information about the group.

18 .     On August 8, 2012, members of the FBI and Boston Police Department obtained an Order from, the Honorable Patti B. Saris, District Judge District of Massachusetts, to begin to intercept two cellular telephones being used by an individual by the name of Alexis Hidalgo (Target Telephone #1 and Target Telephone #2) for a thirty-day period.  On September 25, 2012, members of the FBI and BPD obtained an Order from the Honorable Patti B. Saris, District Judge, District of Massachusetts to begin to intercept a different cellular telephone being used by Alexis Hidalgo (Target Telephone #3) and a cellular telephone being used by Jonathan Dasilva (Target Telephone #4) for a thirty-day period.  This Order was renewed for an additional thirty day period on October 24, 2012, by the Honorable William G. Young, District Judge, District of Massachusetts who also authorized an Order for the interception of a second cellular telephone

used by Jonathan Dasilva (Target Telephone #5) for a thirty day period. On December 21, 2012, members of the FBI and BPD obtained an Order from the Honorable Patti B. Saris, District Judge, District of Massachusetts to intercept two cellular telephones used by Alexis Hidalgo (Target Telephone #3 and Target Telephone #6) and two cellular telephones used by Jonathan Dasilva (Target Telephone #4 and Target Telephone #5) for a thirty-day period. Interceptions pursuant to that order are ongoing.

19.     These intercepted conversations, as well as associated observations and further investigation conducted by law enforcement personnel assigned to this matter has resulted in a more comprehensive understanding of this organization and it's methods. The information gathered from wire interceptions has demonstrated an organization, headed by HIDALGO and DASILVA, whose members routinely carry out drug trafficking and violence as a result of orders issued by DASILVA and HIDALGO. The proceeds gained from DASILVA and HIDALGO'S trafficking efforts is then pooled and utilized to perpetuate further activity by purchasing additional drug product, which is then distributed out to known associates for sale to customers. DASILVA and HIDALGO orchestrate the collection of monies from these sales, repeating the cycle.

**IV.**      **SUMMARY OF EVIDENCE**

**JONATHAN DASILVA**
**40 LANGDON STREET, APARTMENT #1, ROXBURY, MA AND**
**252 KENNEDY DRIVE, APARTMENT #605, MALDEN, MA**

20.     Jonathan DASILVA, date of birth March 05, 1983, **252 Kennedy Drive, Apartment #605, Malden, Massachusetts** and **40 Langdon Street, Apartment #1, Roxbury, Massachusetts**.

21.     I have reviewed the Massachusetts Board of Probation Criminal History Record for

Jonathan DASILVA, date of birth March 05, 1983. A review of this record revealed that

Jonathan DASILVA has adult convictions for:

> Possession to distribute a class D (marijuana) substance,
>
> Possession of a class D substance (marijuana) subsequent offense,
>
> Possession of a class D substance,
>
> Carrying of a dangerous weapon,
>
> Knowingly receiving stolen property and,
>
> Breaking and Entering, Nighttime with intent to commit a felony.

CONTROLLED PURCHASES

22.     On August 2, 2011 a cooperating witness (CW) conducted a controlled drug purchase

from Jonathan DASILVA at the corner of Clifton and Burrell Street in Roxbury, Massachusetts

(MA). The CW purchased approximately 27.5 grams of marijuana. The lab results returned from

testing the substance were positive for the presence of marijuana.

23.     On August 3, 2011 a CW conducted a controlled drug purchase from Jonathan

DASILVA, Benjamin Baptista, and Jerry CORREIA in front of 36 Woodward Avenue Roxbury,

MA. The CW purchases approximately 55 grams of marijuana. The lab results returned from

testing the substance were positive for the presence of marijuana.

24.     On August 10, 2011 a CW conducted a controlled drug purchase from Jonathan

DASILVA in front of 36 Woodward Avenue in Roxbury, MA. The CW purchased

approximately 55.2 grams of marijuana. The lab results returned from testing the substance were

positive for the presence of marijuana.

25.    On December 7, 2011 a CW conducted a controlled drug purchase from Jonathan DASILVA in front of 36 Woodward Avenue in Roxbury, MA. The CW purchased approximately 26.2 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

26.    On January 19, 2012 a CW conducted a controlled drug purchase from Jonathan DASILVA and Jerry CORREIA in front of **40 Langdon Street, Roxbury, MA**. The CW purchased approximately 28.5 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

27.    On January 26, 2012 a CW conducted a controlled drug purchase from Jonathan DASILVA and Jerry CORREIA in front of **40 Langdon Street, Roxbury, MA**. The CW purchased approximately 29.7 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

28.    On January 28, 2012 a CW conducted a controlled drug purchase from Jonathan DASILVA in front of **40 Langdon Street, Roxbury, MA**. The CW purchased approximately 28.5 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

28.    On October 5, 2012 a CW conducted a controlled drug purchase from Jonathan DASILVA in the rear of 36 Woodward Avenue in Roxbury, MA. The CW purchased fifty (50) oxycodone tablets. The lab results sought for this substance are pending though I believe, based on conversations with SA Matthew Knight of the FBI who opined that the drugs purchased were consistent with what he believed to be oxycodone through his training and experience both as an FBI agent and as a Baltimore City Police Officer.

30.    On October 10, 2012 a CW conducted a controlled drug purchase from Jonathan DASILVA in the rear of 36 Woodward Avenue in Roxbury, MA. The CW purchased one hundred (100) oxycodone tablets. The lab results sought for this substance are pending, though I believe, based on conversations with SA Matthew Knight of the FBI who opined that the drugs purchased were consistent with what he believed to be oxycodone through his training and experience both as an FBI agent and as a Baltimore City Police Officer.

## A.    252 KENNEDY DRIVE, APARTMENT #605, MALDEN, MA

### INTERCEPTED PHONE CALLS

31.    On October 02, 2012 at 10:08 a.m. a phone call between Jonathan DASILVA and Joshua BRANDAO was intercepted on Target Telephone #4. Jonathan DASILVA called BRANDAO and yelled at BRANDAO because he has to go to court for the apartment. DASILVA says for 625. BRANDAO tells DASILVA that he was there yesterday. DASILVA says if you were there yesterday then why did they put up an eviction letter. BRANDAO tells DASILVA he is going there now.

32.    On October 02, 2012 at 10:23 a.m. a phone call between Jonathan DASILVA and Joshua BRANDAO was intercepted on Target Telephone #4. BRANDAO explains that he spoke with an unknown lady about the eviction notice that DASILVA got at his apartment.

> **JONATHAN DASILVA**: Yo.
> **JOSHUA BRANDAO**: Yo.
> **JONATHAN DASILVA**: Yo.
> **JOSHUA BRANDAO**: you can throw that paper out.
> **JONATHAN DASILVA**: Huh?
> **JOSHUA BRANDAO**: You can throw that paper out. According… The court's in October. The court is saying October 25th, right?
> **JONATHAN DASILVA**: Yeah.
> **JOSHUA BRANDAO**: Yeah, I just talked, got off the phone with the lady spazzin.
> **JONATHAN DASILVA**: What'd she say?
> **JOSHUA BRANDAO**: She said she doesn't know, she said….

**JONATHAN DASILVA:** You outside/

**JOSHUA BRANDAO:** Huh? No.

**JONATHAN DASILVA:** Why you say throw the paper down?

**JOSHUA BRANDAO:** No, throw it out.

**JONATHAN DASILVA:** Throw it out?

**JOSHUA BRANDAO:** Yeah throw it out. She said, she told me to go there tomorrow with her so she can take my name off the thing for court because I didn't know, she doesn't know why they sent me to court with an eviction letter.

**JONATHAN DASILVA:** It's at 10:15.

**JOSHUA BRANDAO:** Ten if, ten fifteen at, uh, October two thousand, October 25th. She just told me. Yeah, she said, with her so she can go to the court. I'll have to remove that.

**JONATHAN DASILVA:** Your bringing the heat to me, dude.

**JOSHUA BRANDAO:** I'm not bringing no heat to you dude.

33.    On October 02, 2012 at 10:26 a.m. a phone call between Jonathan DASILVA and Joshua

BRANDAO was intercepted on Target Telephone #4. DASILVA calls BRANDAO and instructs

BRANDAO to find out how much the cable bill is. BRANDAO tells DASILVA he'll call and

see right now.

**JOSHUA BRANDAO:** Yo.

**JONATHAN DASILVA:** Yo.

**JOSHUA BRANDAO:** Yeah.

**JONATHAN DASILVA:** Find out how much is the cable bill.

**JOSHUA BRANDAO:** All right, I'm going call and see right now. Hold on.

**JONATHAN DASILVA:** Hit me back.

**JOSHUA BRANDAO:** All right.

34.    On October 06, 2012 at 11:07 a.m. Jonathan DASILVA complained that Joshua

BRANDAO didn't pay the cable bill.

**JOSHUA BRANDA:** Hello.

**JONATHAN DASILVA:** Yelling. U/I.

**JOSHUA BRANDAO:** What's up?

**JONATHAN DASILVA:** What cable bill did you pay Josh, my nigger?

**JOSHUA BRANDAO:** My nigger I paid your bill on dead dogs. I paid the past due.

**JONATHAN DASILVA:** YELLING U/I.

**JOSHUA BRANDAO:** Hold on now. I'm going call right now. Just stay right there. It's between nine and one.

**JONATHAN DASILVA:** U/I.

**JOSHUA BRANDAO:** I can't hear you.

**JONATHAN DASILVA:** Didn't you just say the people are supposed to be here today?

**JOSHUA BRANDAO:** Yeah between nine and one.
**JONATHAN DASILVA:** Still no knock on my door.
**JOSHUA BRANDAO:** Jerky it's a window between nine and one.
**JONATHAN DASILVA:** See what time is it.
**JOSHUA BRANDAO:** Yeah it's 11:30.
**JONATHAN DASILVA:** All right.
**JONATHAN DASILVA:** All right.

35.     On October 08, 2012 at 10:51 a.m. a phone call between Jonathan DASILVA and an

unknown male was intercepted on Target Telephone #4. DASILVA is calling an unknown male

and orders a taxi.

**JONATHAN DASILVA:** I get a cab at **252** Broadway, **Malden**?
**UNKNOWN MALE:** In **Malden**?
**JONATHAN DASILVA:** Yeah.
**UNKNOWN MALE: 252** Broadway, we don't....
**JONATHAN DASILVA: Kennedy Drive, Kennedy Drive.**
**UNKNOWN MALE: Kennedy.** What's your apartment number?
**JONATHAN DASILVA: 605.**
**UNKNOWN MALE:** Where are you going?
**JONATHAN DASILVA:** Um, Boston.
**UNKNOWN MALE:** All right, in about ten minutes.
**JONATHAN DASILVA:** All right.

36.     On October 24, 2012 at 12:13 p.m. a phone call between Jonathan DASILVA and an

unknown male was intercepted on Target Telephone #4. DASILVA was giving the unknown

male directions to his apartment located at **252 Kennedy Drive, Apartment #605, Malden,**

**MA**.

**UNKNOWN MALE:** Yo, I'm pulling up to the thing. What's the building?
**JONATHAN DASILVA: 252.**
**UNKNOWN MALE: 252**, apartment what?
**JONATHAN DASILVA: 605.**
**UNKNOWN MALE: 605, 252, 605**, OK. All right, I got you.

37.     On November 02, 2012 at 12:13 p.m. a phone call between Jonathan DASILVA and an

unknown male was intercepted on Target Telephone #4. DASILVA was giving the unknown

male directions to his apartment.

**UNKNOWN MALE:** Hey, yo, what building is it?
**JONATHAN DASILVA: 252.**
**UNKNOWN MALE: 252?** Apartment what?
**JONATHAN DASILVA: 605.**
**UNKNOWN MALE:** All right cool. **252, apartment 605?** Yes.
**JONATHAN DASILVA:** UI
**UNKNOWN MALE:** All right. Hey, um, I got leave ASAP see if you can do ASAP.
**JONATHAN DASILVA:** What happened?
**UNKNOWN MALE:** See we can... come down ASAP. I got to bounce ASAP.
**JONATHAN DASILVA:** Oh yeah I'm coming down right now.
**UNKNWON MALE:** All right I'll be in a sec.

38.     On November 14, 2012 at 2:04 p.m. Jonathan DASILVA called an unknown male and

discussed the lease to his apartment, **252 Kennedy Drive, Apartment #605, Malden**.

DASILVA wanted the unknown male to call and pretend that he was Joshua BRANDAO who is

the lessee. At the time of this call BRANDAO was in custody on a firearm charge.

> **UNKNWON MALE:** Hello.
> **JONATHAN DASILVA:** Estaban?
> **UNKNWON MALE:** Yo.
> **JONATHAN DASILVA:** It's Jerky.
> **UNKNWON MALE:** What up yo?
> **JONATHAN DASILVA:** What's the deal? Hey, yo, they just sent me a paper in the, in the regarding to uh for Joshua to call them. I'm texts you they number, you Josh's uh information, call them and be like uh I just got a notice talking bout for ya'll, for me to call y'all in forty-eight hours and what is it regard. If they're telling about the renewal, the rent or the, or the amount due tell them you've been going to court. That every time you've been paying rent, it's, it's, you pay fourteen uh, you pay uh, nineteen eighty or nineteen. You pay fourteen hundred basically, write a check out for, you make out a money order for fourteen all the time. You had when you first moved in there, it was a special, they keep giving you the remaining balance, saying you owe them, but you don't owe them, and your trying to uh... What's the problem? They just gave you a forty basically let me see what the letter say. It says two fifty two (252) regarding a balance of oh, it says regarding a balance of a thousand eleven hundred pending an eviction notice. Tell them why do have that if you paid the rent already, fourteen hundred that every month it keep coming up saying that you owe the balance and then y'all clear it.
> **UNKNOWN MALE:** Is this for the apartment you staying in?
> **JONATHAN DASILVA:** Yeah.
> **UNKNOWN MALE:** All right you going be in the hood?
> **JONATHAN DASILVA:** Yeah. Where you at?
> **UNKNOWN MALE:** I'm in Newton right now.

**JONATHAN DASILVA:** I'm you the uh, picture of it dog. You can call, I'm text you the number and the you can just call em, they telling you to call em or whatever, you ain't got to go there.
**UNKNOWN MALE:** All right, try to send me the picture of the letter too so I can like...Read it.
**JONATHAN DASILVA:** All right.
**UNKNOWN MALE:** All right, later.

Records from National Grid (which provide electrical in the city of Malden) show that it provides service to **252 Kennedy Drive, apartment #S605, Malden, Massachusetts**. The subscriber for that service is Joshua Brandao, telephone number 1-857-334-8542. I believe the "S" to be an error and that the correct address is #605.

OBSERVATIONS OF JONATHAN DASILVA AT
252 KENNEDY DRIVE, APARTMENT #605, MALDEN

39.     Surveillance observations throughout the investigation have shown that Jonathan DASILVA resides at **252 Kennedy Drive, Massachusetts**.

40.     On September 29, 2012 surveillance units observed Jonathan DASILVA inside of his apartment at **252 Kennedy Drive**, as well as, on the balcony to his apartment.

41.     Most recently Most recently on January 01, 2013 a series of phone calls with Jonathan DASILVA and Alexis HIDALGO on Target Telephone #5 revealed that Jonathan DASILVA was going to purchase several pounds of marijuana from a source of supply who, lives in Kingsbridge, Bronx, New York. At 3:05 p.m. Jonathan DASILVA was intercepted talking to Alexis HIDALGO on Target Telephone #5 asking HIDALGO to follow him once Jonathan DASILVA picks up the marijuana. HIDALGO told him of course, you know. This interception, previous interceptions, and surveillance have revealed that Jonathan DASILVA and HIDALGO will follow one another when picking up drugs from their source of supply as a counter-surveillance technique. Subsequent phone calls on Target Telephone #5 revealed that Jonathan DASILVA did pick up the marijuana in the Bronx and that Jonathan DASILVA traveled back to

Malden with the marijuana. At 7:28 p.m. surveillance observed Jonathan DASILVA arrive at

**252 Kennedy Drive, Malden** from New York operating his Audi. Surveillance observed

Jonathan DASILVA remove white and black shopping bags from the rear of his motor vehicle

and enter **252 Kennedy Drive, Malden** with these bags. Based on these observations and

intercepted phone calls I believe that Jonathan DASILVA was carrying the marijuana that he

purchased in Kingsbridge, Bronx, New York into **252 Kennedy Drive**.

**B.     40 LANGDON STREET, APARTMENT #1, ROXBURY, MA**

<u>INTERCEPTED PHONE CALLS</u>

42.     On September 29, 2012 at 4:05 p.m. a telephone call was intercepted on Target

Telephone #5. The participants were Jonathan DASILVA and Jerry CORREIA. During the

conversation Jerry CORREIA, informed Jonathan DASILVA that he collected twelve-three

($12,300) from Lino CORREIA a/k/a "L" a/k/a "HAJJ", and seven-six ($7,600) from an

unknown male "JOEY". Jerry CORREIA then tells Jonathan DASILVA that he has given twenty

($20,000) to Jonathan DASILVA'S mother.

> **JERRY CORREIA:** Yo.
> **JONATHAN DASILVA:** Yo.
> **JERRY CORREIA:** I just gave your moms U/I dollars of off twenty.
> **JONATHAN DASILVA:** Huh?
> **JERRY CORREIA:** I gave your mom's twenty.
> **JONATHAN DASILVA:** You gave it to my moms?
> **JERRY CORREIA:** Yeah.
> **JONATHAN DASILVA:** From who? From L?
> **JERRY CORREIA:** From L and JOEY.
> **JONATHAN DASILVA:** Joey cashed you for the four?
> **JERRY CORREIA:** Yeah.
> **JONATHAN DASILVA:** What he gave you?
> **JERRY CORREIA:** Um... Seven- six.
> **JONATHAN DASILVA:** Huh!
> **JERRY CORREIA:** Seven, Seven,-six!
> **JONATHAN DASILVA:** Seven-six?
> **JERRY CORREIA:** Yeah, and Hajj gave me twelve-three... For six and half to pay for (U/I).
> **JONATHAN DASILVA:** All right.

**JERRY CORREIA:** All right.
**JONATHAN DASILVA:** Later.

43.     On December 29, 2012 at 9:15 p.m. Jonathan DASILVA was intercepted on using phone

617-477-7395, having a conversation with Alexis HIDALGO on Target Telephone #3.

HIDALGO informed Jonathan DASILVA that he received information that they were being

targeted to be robbed. DASILVA accuses HIDALGO of "Zinging" (selling drugs at **500**

**Broadway Street, Apt. #3161, Malden, MA**) and HIDALGO tells DASILVA that he only

recently sold drugs from residence.

**JONATHAN DASILVA:** Yo.
**ALEXIS HIDALGO:** Where you at?
**JONATHAN DASILVA:** Over here at the crib.
**ALEXIS HIDALGO:** Shit dude, it's time to abandon ship dude.
**JONATHAN DASILVA:** Huh?
**ALEXIS HIDALGO:** I said we got to get out up off of these spots ASAP.
**JONATHAN DASILVA:** Why? What happened?
**ALEXIS HIDALGO:** Them kids got the drop on niggas dog.
**JONATHAN DASILVA:** Who?
**ALEXIS HIDALGO:** Them stick up niggas man.
**JONATHAN DASILVA:** How?
**ALEXIS HIDALGO:** Nigga I don't know how nigga I just got word right now nigga
and they was like man, tell your man stay off that instagram too. It's all about you so
niggas is on niggas.
**JONATHAN DASILVA:** Who?
**ALEXIS HIDALGO:** The nigga, that nigga, who you wit over there?
**JONATHAN DASILVA:** I'm with shorty.
**ALEXIS HIDALGO:** Rolling some bud?
**JONATHAN DASILVA:** Yeah.
**ALEXIS HIDALGO:** The niggas Leak and them. Don't say nothing to nobody. Leak
and them niggas.
**JONATHAN DASILVA:** Who?
**ALEXIS HIDALGO:** Leak nigga! The nigga that dusted the nigga at that boat cruise.
That nigga done dusted a couple niggas off this (U/I) my nigga.
**JONATHAN DASILVA:** The nigga tell you I know, I know.
**ALEXIS HIDALGO:** Oh yeah you know em, that nigga is on nigga's backs on the low.
**JONATHAN DASILVA:** Who said that Sleeze?
**ALEXIS HIDALGO:** Yeah he was just like you P don't mention it to nobody cause
they… All them niggas be this nigga's shit and just be word to get back to him. Just keep
that between me and you. Just tell Jerky, tell Jerky don't tell nobody.
**JONATHAN DASILVA:** That's what he said?

**ALEXIS HIDALGO:** Yeah he said them niggas know my spot and was like we know P is up in Malden (referring to **500 Broadway Street, Apartment # 3161, Malden, MA**).
**JONATHAN DASILVA:** Maybe Zinging, know who they are nigga.
**ALEXIS HIDALGO:** Zinging?! Nigga I this, this week is the first time I served a play over there nigga. I never served a play over here nigga!
**JONATHAN DASILVA:** (U/I) You get what I'm trying to tell you?
**ALEXIS HIDALGO:** What?
**JONATHAN DASILVA:** I don't think, I don't think they got that on me. Only if these niggas talking yo.
**ALEXIS HIDALGO:** Who? My nigga what makes you think they don't know got on those niggas? My nigga they was at pat's crib yesterday waiting for em my nigga. And that's Sleeze's man and that and nigga Sleeze's cousin Black nigga so what you think you, you don't they got the drop on niggas?
**JONATHAN DASILVA:** Yo so what? Say it again.
**ALEXIS HIDALGO:** I said they was in front of Pat's crib waiting for em yesterday nigga. You think they don't got the drop on niggas? You crazy. Niggas do they homework my nigga. Out of here here nigga I ain't fucking around nigga. That (U/I) is too dangerous for me right there dog. I don't know I'm about to be at the crib I'm about to get my braided. Be easy bro I'm bout to bring my "Yamean" over there.
**JONATHAN DASILVA:** (DASILVA grunts).
**ALEXIS HIDALGO:** Hit you in a minute. What you doing? Staying in right?
**JONATHAN DASILVA:** Right, ain't fucking around.
**ALEXIS HIDALGO:** (U/I).
**JONATHAN DASILVA:** Shit. Eleven, ten thirty, eleven so hit me.
**ALEXIS HIDALGO:** All right.
**JONATHAN DASILVA:** All right.

44.     On December 29, 2012, at 9:24 p.m. HIDALGO calls DASILVA while using Target

Telephone #3. HIDALGO talks about getting his bread (money) out of his apartment (**500**

**Broadway Street, Apartment #3161, Malden, MA**). DASILVA told HIDALGO that he does

not keep paper (money) at his place, and that he keeps the money at his mother's house (**40**

**Langdon Street, Apartment #1, Roxbury, MA**). The following is an excerpt from call on

December 29, 2012 at 9:24 p.m. on Target Telephone #5.

**ALEXIS HIDALGO:** I gotta get this bread out of here though.
**JONATHAN DASILVA:** I ain't got no paper here like that. I put that shit at
Moms' (**40 Langdon Street, Apartment #1, Roxbury, MA**).

## OBSERVATIONS OF JONATHAN DASILVA
## AT 40 LANGDON STREET, ROXBURY

45.     Throughout this investigation surveillance has been conducted at **40 Langdon Street,**
**Roxbury**. This surveillance was based on intercepted phone calls on Target Telephones four and
five. Based on these intercepted phone calls and surveillance it is my opinion and the collective
opinion of fellow investigators that Jonathan DASILVA uses his family's residence, at **40**
**Langdon Street, Apartment #1, Roxbury, MA**, to store proceeds from his illegal sale of
narcotics and also as a distribution location for these sales. Furthermore this investigation
revealed that Jonathan DASILVA employs his younger siblings to transport money, and
distribute narcotics for him, out of **40 Langdon Street, Apartment #1, Roxbury, MA.**

46.     On August 24, 2012 at 8:30 p.m., Jonathan DASILVA was observed by Boston Police
officers operating a moped inside of Clifford Park in Roxbury, Massachusetts. Officers followed
the moped until Jonathan DASILVA parked it in front of **40 Langdon Street, Roxbury**. As
officers approached Jonathan DASILVA they observed Jonathan DASILVA reach into a motor
vehicle in front of **40 Langdon Street**. Upon seeing the officers approaching, Jonathan
DASILVA quickly walked up the stairs of **40 Langdon Street**. Officers observed Jonathan
DASILVA carrying a brown paper bag, and also observed Jonathan DASILVA discard the bag
into the common hallway of **40 Langdon Street**. Jonathan DASILVA then turned and walked
back down the stairs towards the officers. Officers recovered the bag, observed a large amount of
United States currency, and questioned Jonathan DASILVA and the occupant of the motor
vehicle Bryan Saintilus. Jonathan DASILVA told the officers that he was going to buy the motor
vehicle that Saintilus was driving. When asked about the sale of the motor vehicle Saintilus
informed officers that he was just visiting Jonathan DASILVA and had no intention of selling or

buying a car. Saintilus also informed the officers that the motor vehicle he was operating was a rental car and that he could not sell it. Based on these observations and the conflicting stories that Jonathan DASILVA and Saintilus told the officers a decision was made to seize the money. The brown bag was found to contain $18,800 dollars United States currency. Officers have moved to have the money that was recovered forfeited.

47.     On January 02, 2013 at 9:59 p.m. Jonathan DASILVA called Shumane Garvin on Target Telephone #5 and instructs her to pick up an ounce of marijuana at 40 Langdon Street and then go and drop it off to an unknown male in South Boston. At 10:13 p.m. surveillance observes GARVIN arrive at **40 Langdon Street**, approach the door and return to her car seconds later.

48.     Most recently, on January 9, 2013 at 9:58 a.m. Jonathan DASILVA began, a series of conversations with Alexis HIDALGO, on Target Telephone #5. These conversations revealed that Jonathan DASILVA was planning on traveling to New York to pick up marijuana. During one of the calls Jonathan DASILVA asked HIDALGO if he had ten bands (ten thousand dollars ($10,000) that he could borrow. HIDALGO informed Jonathan DASILVA that he had ten thousand dollars ($10,000), but he needed it for his share of the marijuana.  Jonathan DASILVA stated that he would just go to hood to grab it then. At 11:23 a.m. surveillance observed Jonathan DASILVA arrive at **40 Langdon Street**, operating his Audi. A black-non-Hispanic male, believed to Justin DASILVA, exited **40 Langdon Street**, carrying a white shopping bag, and approached the Audi. The male, who surveillance believed to be Justin DASILVA, then approached the passenger window and placed the bag into Jonathan DASILVA'S motor vehicle. Jonathan DASILVA then drove away from the area and the male entered **40 Langdon Street**. Subsequent intercepted phone calls, and GPS data from Jonathan DASILVA'S phone revealed that he did in fact travel to New York and purchase a quantity of marijuana.

49.     I have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and

found that Jonathan DASILVA provides **40 Langdon Street, Apartment #1, Roxbury,**

**Massachusetts** as his residential address on his Massachusetts' driver's license #S46581703.I

have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and found

that Jonathan DASILVA'S motor vehicle, Massachusetts registration #793SM5, a 2005 Audi

A6, is registered to Clarimundo DASILVA of **40 Langdon Street, Roxbury**.  I have conducted

a query through the Criminal Justice Information Systems (CJIS), which revealed that Jonathan

DASILVA provides **40 Langdon Street, Apartment #1, Roxbury** as his residential address on

his Board of Probation Records.  Records from NSTAR (which provide electricity in the city of

Boston) show that it provides service to **40 Langdon Street, Apartment #1, Roxbury**, and that

the account is in the name Clarimundo DASILVA.

**ALEXIS HIDALGO**
**500 BRAODWAY STREET, APARTMENT #3161, MALDEN, MA AND**
**220 PEARL STREET, APARTMENT #2, SOMERVILLE, MA**

50.     Alexis HIDALDO, date of birth January 12, 1981, resides at **500 Broadway Street,**

**apartment #3161, Malden, Massachusetts,** and uses his family residence at **220 Pearl Street,**

**Apartment #2, Somerville, Massachusetts** to store drug proceeds.

51.     I have reviewed the Massachusetts Board of Probation Criminal History

 Record for Alexis HIDALGO, date of birth January 12, 1981. A review of this record revealed

that Alexis HIDALGO has a record that includes the following convictions as an adult:

        Possession to Distribute a Class B (Cocaine) Substance

        Possession of a Class D (Marijuana) Substance

        Unlawful Possession of Firearm

        Discharging a Firearm within 500' of a Dwelling

Robbery

Assault and Battery with a Dangerous Weapon

Assault and Battery

Willful and Malicious Injury to Personal Property

<u>CONTROLLED PURCHASES</u>

52.     On August 15, 2011 a CW conducted a controlled drug purchase from Alexis HIDALGO in front of 36 Woodward Avenue in Roxbury, MA. The CW purchased approximately 6.8 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine. approximately 6.8 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

53.     On August 23, 2011 a CW conducted a controlled drug purchase from Alexis HIDALGO in front of 36 Woodward Avenue in Roxbury, MA.  The CW purchased approximately 27.7 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

54.     On October 5, 2011 a CW conducted a controlled drug purchase from Alexis HIDALGO, Hamilton Lopes, John WEBBE and Victor SCOTT at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 5.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

55.     On October 12, 2011 a CW conducted a controlled drug purchase from Alexis HIDALGO and Victor SCOTT at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 5.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

56.    On February 25, 2012 a CW conducted a controlled drug purchase from Alexis

HIDALGO and John WEBBE at 37 Hendry Street in Dorchester, MA. The CW purchased

approximately 30.9 grams of crack cocaine. The lab results returned from testing the substance

were positive for the presence of cocaine.

57.    On April 6, 2012 a CW conducted a controlled drug purchase from Alexis HIDALGO at

37 Hendry Street in Dorchester, MA. The CW purchased approximately 28 grams of crack

cocaine. The lab results returned from testing the substance were positive for the presence of

cocaine.

58.    On May 3, 2012 a CW conducted a controlled drug purchase from Alexis HIDALGO at

37 Hendry Street in Dorchester, MA. The CW purchased approximately 28 grams of crack

cocaine. The lab results returned from testing the substance were positive for the presence of

cocaine.

59.    On June 27, 2012 a CW conducted a controlled drug purchase from Alexis HIDALGO

and Victor SCOTT at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 28

grams of crack cocaine. The lab results returned from testing the substance were positive for the

presence of cocaine.

60.    On July 28, 2012 a CW conducted a controlled drug purchase from Alexis HIDALGO at

225 Blue Hill Avenue apartment 208 in Roxbury, MA. The CW purchased approximately 56

grams of crack cocaine. The lab results sought for this substance are pending. The field test

conducted was positive for the presence of cocaine.

61.    On August 31, 2012 a CW conducted a controlled drug purchase from Alexis HIDALGO

at 225 Blue Hill Avenue apartment 208 in Roxbury, MA. The CW purchased approximately 56

grams of crack cocaine. The lab results sought for this substance are pending. The field test conducted was positive for the presence of cocaine.

## C.     500 BROADWAY STREET, APARTMENT #3161, MALDEN, MA

### INTERCEPTED PHONE CALLS

62.     During numerous intercepted phone calls and SMS text messages HIDALGO has provided his residential address. The following are examples:

63.     On October 15, 2012 at 8:34 PM HIDALGO was intercepted speaking with Christina DEBURGO on target telephone #3. HIDALGO and DEBURGO discussed a National Grid bill that is in the name of DEBURGO. DEBURGO informed HIDALGO that she contacted National Grid and asked HIDALGO is he was sure the service provider was not NSTAR. HIDALGO tells DEBURGO that he has the slip in his pocket. HIDALGO checks the slip and confirms that it is a National Grid account, #1477138105, **Apartment # 3161, 500 Broadway**.  Records from National Grid (which provide electrical in the city of Malden) show that it provides service to **500 Broadway Street, Apartment #3161, Malden, Massachusetts**. The subscriber for that service is Christina Deburgo, providing a contact number of 617-459-9789, which is HIDALGO'S phone number.

64.     October 19, 2012 HIDALGO, using Target Telephone #3, sent a SMS text message to John Webbe telling him WEBBE his address, **500 Broadway Street, Malden**.

65.     On December 27, 2012 HIDALGO, using Target Telephone #3, sent Victor SCOTT a SMS text message telling SCOTT his address, **500 Broadway Street, Malden**.

66.     On January 08, 2013 HIDALGO had a conversation with an unknown female on Target Telephone #3 and she told HIDALGO to text her his address. HIDALGO then sent a SMS text message to her, **500 Broadway Street, Malden**.

## OBSERVATIONS OF HIDALGO AT
## 500 BROADWAY STREET, APARTMENT #3161, MALDEN, MA

67.    Most recently on January 08, 2013 HIDALGO had a conversation with Morris Robinson

on Target Telephone #3 during which ROBINSON asks HIDALGO if he is at his crib.

HIDALGO says he is. At 1:13 p.m. surveillance units observed ROBINSON arrive at **500**

**Broadway Street, Malden, Massachusetts** registration #592SK4, a 2012 KIA RIO, and park in

the lot of **500 Broadway, Malden, Massachusetts**.  Surveillance observe ROBINSON exit the

passenger seat of this motor vehicle, go to the trunk, remove a black shoe box and walk to the

side door of **500 Broadway Street, Malden, Massachusetts**.  Robinson was wearing a black

hat, a black hooded sweatshirt, and black sweatpants.

68.    Later on in the day on January 08, 2013 surveillance observed Hamilton Lopes arrive at

**500 Broadway, Malden, Massachusetts** operating Massachusetts' registration #3FRT60, a

1998 BMW 740IL registered to LOPES. Lopes then exits, the vehicle and walks to the side

entrance. At 1:33 p.m. LOPES was intercepted calling HIDALGO on Target Telephone #3.

LOPES, tells HIDALGO that he is at the door. HIDALGO says all right. At 1:39 p.m.

surveillance observed LOPES exit the side entrance of **500 Broadway Street, Malden, MA**

enter his motor vehicle and drive away.  Surveillance units have observed HIDALGO and

HIDALGO'S motor vehicles parked unattended at this address throughout the investigation.

## D.    220 PEARL STREET, APARTMENT #2, SOMERVILLE, MA

### INTERCEPTED PHONE CALLS

69.    On October 02, 2012 at 10:31 a.m. Maurice Barnett, who is a marijuana source of supply

for HIDALGO, called HIDALGO on Target Telephone #3 and asked HIDALGO if he is going

to "do that". HIDALGO asks how much and BARNETT says 2-0. HIDALGO says he'll come

see BARNETT. At 10:34 a.m. HIDALGO calls his mother Carmen Otero and asks if she put that

money away. OTERO responds no. HIDALGO says he'll come by. At 11:25 a.m. surveillance units observe HIDALGO enter **220 Pearl Street, Somerville.** At 11:40 a.m. surveillance units observe HIDALGO exit **220 Pearl Street, Somerville.** Based on the intercepted phone calls and observations made of HIDALGO I believe that BARNETT wanted HIDALGO to give him twenty thousand, $20,000 to recoup a drug debt, HIDALGO called OTERO to see if she put his money away, and then went to **220 Pearl Street, Somerville** to retrieve the $20,000 as payment to BARNETT.

70. On October 05, and October 06, 2012 there were a series of phone calls between HIDALGO and Julio COLLAZOS. HIDALGO called COLLAZOS to, facilitate the purchase of a kilogram of cocaine from, COLLAZOS.

71. On October 05, 2012 at 1:32 p.m. HIDALGO was intercepted having a conversation with COLLAZOS on Target Telephone #3. HIDALGO and COLLAZOS were discussing the price that COLLAZOS could get a kilogram of cocaine for HIDALGO. COLLAZOS said he can it for $43,000.

> **ALEXIS HIDALGO**: Yo.
> **JULIO COLLAZOS**: Yeh, what's up?
> **ALEXIS HIDALGO**: What's good H?
> **JULIO COLLAZOS**: Shit. You hit me?
> **ALEXIS HIDALGO**: Yeah. What, what you say was the ticket on the twerky?
> **JULIO COLLAZOS**: On the three. I, I can get it. I'll give it to you like right there. Same thing.
> **ALEXIS HIDALGO**: What?
> **JULIO COLLAZOS**: For forty-three, that's what the nigga saying.
> **ALEXIS HIDALGO**: All right, fuck it, damn…What, what time are you going to try to do it? Like five or something.
> **JULIO COLLAZOS**: Oh, you talking about later on tonight you want to do it?
> **ALEXIS HIDALGO**: Yeah, cause I gotta wait till Shorty gets to the crib, so I can grab the paperwork (I know "paperwork" to be street code for money).
> **JULIO COLLAZOS**: All right.

72.    On October 06, 2012 at 5:07 p.m. COLLAZOS calls HIDALGO on Target Telephone #3

and tells him he is on his way. HIDALGO tells COLLAZOS that he has to go to his house to

grab the bread (money).

>    **ALEXIS HIDALGO:** Yo.
>    **JULIO COLLAZOS:** Yo, I'm on my way.
>    **ALEXIS HIDALGO:** All right, I gotta go to the crib and grab the bread.
>    **JULIO COLLAZOS:** All right. So what we talking, half an hour, an hour?
>    **ALEXIS HIDALGO:** Yeah.
>    **JULIO COLLAZOS:** You gotta be for real my nigga, don't make me wait for you.
>    **ALEXIS HIDALGO:** How long is it gonna take you you to get over here?
>    **JULIO COLLAZOS:** Nigga you know… I'm coming right back, I'm coming from
>    Providence, so forty-five minutes…Forty minutes.
>    **ALEXIS HIDALGO:** All right, all right, come on.
>    **JULIO COLLAZOS:** I'm, I'm a meet you over there at the other spot right? Cause I
>    ain't going down there.
>    **ALEXIS HIDALGO:** Yeah, yeah, yeah, yeah.
>    **JULIO COLLAZOS:** All right my nigga don't hess, I'm ma hit you, so just pick up.
>    **ALEXIS HIDALGO:** All right, all right.

73.    On October 06, 2012 at 5:26 p.m. HIDALGO is intercepted calling mother Carmen

OTERO on Target Telephone #3. HIDALGO called OTERO, looking for money top purchase

the kilogram of cocaine from COLLAZOS. A young male, believed to be HIDALGO'S son

answers the phone and eventually hands the phone to OTERO. OTERO tells HIDALGO that the

money is in her room where she keeps her shoes.

>    **UNKNOWN MALE:** Hello.
>    **ALEXIS HIDALGO:** Ask her where she put that.
>    **UNKNOWN MALE:** She, she said you know.
>    **ALEXIS HIDALGO:** All right, whose going up there with y'all?
>    **UNKNOWN MALE:** It's just me, and my two friends.
>    **ALEXIS HIDALGO:** Put, put her on the phone.
>    **CARMEN OTERO:** Hello.
>    **ALEXIS HIDALGO:** Um, um where did you put that?
>    **CARMEN OTERO:** What?
>    **ALEXIS HIDALGO:** That money.
>    **CARMEN OTERO:** Are you going take it again?
>    **ALEXIS HIDALGO:** Yeah, cause this girl is with her mother. I can't even get in the
>    house.
>    **CARMEN OTERO:** Uh, why can't you go home?

**ALEXIS HIDALGO:** Cause I don't got the keys. She got the car. They got the keys in the car.
**CARMEN OTERO:** Oh, um, you know where… In my room. Where all my shoes are at. All over the floor, all the sandals.
**ALEXIS HIDALGO:** Yeah.
**CARMEN OTERO:** You know then… There's a thing to put things at and that's where the white thing is at.
**ALEXIS HIDALGO:** All right.
**CARMEN OTERO:** (U/I).
**ALEXIS HIDALGO:** All right.
**CARMEN OTERO:** Did you find it?
**ALEXIS HIDALGO:** No, I'm not over there yet. I'm about to be there.
**CARMEN OTERO:** Oh okay. Okay bye.

74.     Most recently on January 9, 2013 HIDALGO spoke with Jonathan DASILVA on Target

Telephone #3.The were discussing picking up marijuana from a source of supply in New York

City. During this conversation Jonathan DASILVA asked HIDALGO if HIDALGO he had any

bands (a band equals $1,000) over there because all of Jonathan DASILVA'S money was in the

hood. Jonathan DASILVA then asked HIDALGO if he had ten bands. HIDALGO explained to

Jonathan DASILVA that he had put his money at mom dukes' house (mother's house **220 Pearl**

**Street, Apartment #2, Somerville, MA**) last night. HIDALGO explained to Jonathan

DASILVA that he could swing by there. Jonathan DASILVA told HIDALGO he would just go

to the hood and grab it. Based on electronic intercepts and surveillance.

75.     Carmen Otero is the mother of Alexis HIDALGO. I have conducted an inquiry of the

Massachusetts Registry of Motor Vehicle records and found that OTERO provides **220 Pearl**

**Street, Apartment #2, Somerville,** as her residential address on her Massachusetts' driver's

license #56090942.   I have conducted an inquiry of the Massachusetts Registry of Motor

Vehicle records and found that HIDALGO also lists **220 Pearl Street, Apartment #2,**

**Somerville,** as his residential address. Records from NSTAR (which provide electricity in the

city of Somerville) show that it provides service to **220 Pearl Street, Apartment #2, Somerville**

and that the account is in the name Carmen Otero. It is my opinion and the collective opinion of fellow law enforcement officers that HIDALGO uses his mother's (Carmen Otero) residence located at **220 Pearl Street, Apartment #2, Somerville, MA** to store drug proceeds.

## MOISES FIGUEROA
## 855 AMERICAN LEGION HIGHWAY, APARTMENT #3C, ROSLINDALE, MA AND 91 BARTON ROAD WELLESLEY HILLS, MA

76.     Moises Figueroa, date of birth December 24, 1978, **855 American Legion Highway, Apartment #3C, Roslindale, Massachusetts** and **91 Barton Road, Wellesley Hills, MA** .

77.     I have reviewed the Massachusetts Board of Probation Criminal History Record for Moises Figueroa, date of birth December 24, 1978. A review of this record revealed that Moises FIGUEROA has a seventeen-page record that includes adult convictions for:

>               Possession of a Class B (Cocaine) substance
>
>               Possession of Class D (Marijuana) substance
>
>               Unlawful Possession of a Firearm
>
>               Assault Dangerous Weapon
>
>               Resisting Arrest
>
>               Operating Under the Influence of Alcohol
>
>               Operating after Revocation
>
>               Operating after Suspension

## CONTROLLED PURCHASES

78.     On October 25, 2011 a CW conducted a controlled drug purchase from Moises Figueroa at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 25.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

79.     On November 1, 2011 a CW conducted a controlled drug purchase from Moises

Figueroa, Victor Scott and Nicholas Otey at 37 Hendry Street in Dorchester, MA. The CW

purchased approximately 24.8 grams of crack cocaine. The lab results returned from testing the

substance were positive for the presence of cocaine.

80.     On November 14, 2011 a CW conducted a controlled drug purchase from Moises

Figueroa, John Webbe and Hamilton Lopes at 37 Hendry Street in Dorchester, MA. The CW

purchased approximately 29 grams of crack cocaine. The lab results returned from testing the

substance were positive for the presence of cocaine.

81.     On November 25, 2011 a CW conducted a controlled drug purchase from Moises

Figueroa at **91 Barton Road, Wellesley Hills, MA**. The CW purchased approximately 27.7

grams of crack cocaine. The lab results returned from testing the substance were positive for the

presence of cocaine base.

## E.     855 AMERICAN LEGION HIGHWAY, APARTMENT # 3C, ROSLINDALE, MA

### INTERCEPTED PHONE CALLS

82.     On August 22, 2012 at 12:18 p.m. Moises FIGUEROA called Alexis HIDALGO on

Target Telephone #1. During the following phone call HIDALGO asks FIGUEROA about

contacting a source of supply for cocaine.

> **ALEXIS HIDALGO**: Yo.
>
> **MOISES FIGUEROA**: What's the word Brodie?
>
> **ALEXIS HIDALGO:** What's up with homeboy?
>
> **MOISES FIGUEROA**: You already know.
>
> **ALEXIS HIDALGO**: Same Page?

**MOISES FIGUEROA**: Nothing changed.

**ALEXIS HIDALGO**: He's, he's right though right ?

**MOISES FIGUEROA**: Yeah.

**ALEXIS HIDALGO**: Well tell him like four, I'm going to Ma Duke's crib.

**MOISES FIGUEROA**: Just hit me up cause I'm grabbing something for my mom, give me like an hour he said.

**ALEXIS HIDALGO**: All right. Just call me when you're about to do that,

**MOISE FIGUEROA**: All right.

**ALEXIS HIDALGO**: All right.

83.     On September 27, 2012 at 10:52 a.m. HIDALGO calls FIGUEROA, USING target

Telephone #3, and orders a half of a kilogram of cocaine from FIGUEROA. The two complain

about the current prices of cocaine.

**MOISE FIGUEROA**: Yo.

**ALEXIS HIDALGO**: Yo.

**MOISE FIGUEROA** : What's the word?

**ALEXIS HIDALGO**: What's good with homeboy, he's right?

**MOISE FIGUEROA**: Huh?

**ALEXIS HIDALGO:** Homeboy right?

**MOISE FIGUEROA** : Yeah.

**ALEXIS HIDALGO:** The numbers, still the same thing?

**MOISE FIGUEROA:** Last time I checked, yeah. Been trying to tell that nigga to go down too.

**ALEXIS HIDALGO**: Yeah nigga, everybody seeding that forty-four shit nigga.

**MOISE FIGUEROA:** I'll holler at him nigga.

**ALEXIS HIDALGO:** Fuckin, ummm. See if he got a half there, and let me know if he say yeah so I can get it together real quick.

**MOISE FIGUEROA:** All right, I'll call you right back. I'm make sure it's the tan shit cause he gave me that white shit, and P I ain't gonna lie to you my nigga. I ain't even.

Nigga. If I made right now, so far what I'm lookin at, if I made four, four, that's enough nigga, but. Nigga I don't even think I'm making four because I already know that I take out a stack just to pay my bills, so it's like damn nigga, I spent twenty. Fuckin twenty-three just to see mother fucking, twenty-seven my nigga.

**ALEXIS HIDALGO**:  Yeah that's crazy dawg, that's fucked.

**MOISE FIGUEROA**: I'm just gonna make sure this nigga don't got that white. As long as it ain't white, it's straight.

**ALEXIS HIDALGO**: All right. Just hit me back.

**MOISE FIGUEROA:** Out.

84.   On September 27, 2012 at 10:54 a.m. Moises FIGUEROA calls Alexis HIDALGO on Target Telephone #5 and tells him that his source of supply has the good cocaine, the beige colored cocaine. HIDALGO tells him he is going to grab his change (money) and see him in an hour.

**ALEXIS HIDALGO:** Yo.

**MOISE FIGUEROA:**  Yeah he got that beige.

**ALEXIS HIDALGO:**  He got beige?

**MOISE FIGUEROA:** Got the beige.

**ALEXIS HIDALGO:** All right, tell him like a hour. I'm gonna grab all my change.

**MOISE FIGUEROA:** All right cool, just give me a call.

OBSERVATIONS OF MOISES FIGUEROA AT

855 AMERICAN LEGION HIGHWAY, APARTMENT #3C, ROSLINDALE, MA

85.   Following this series of phone calls units began to conduct surveillance at **855 American Legion Highway**, Moises FIGUEROA'S residence.  The following is a summary of their observations:

86.   12:52 p.m.- Detective Brown reported that HIDALGO'S motor vehicle, Massachusetts' registration #811SM3, had parked on American Legion Highway outside of **855 American Legion Highway**. Hidalgo and Patrick Gomes exit the motor vehicle, Hidalgo was wearing a

white colored T-shirt, blue jeans and Patrick Gomes was wearing a black colored jacket, gray jeans. Both parties walk towards the rear of the address. Detective Marvin Wright observed Hidalgo and Gomes meet up with an unknown light skinned male wearing a white T-shirt (believed to be Moises FIGUEROA), and all three entered the rear door of **855 American Legion Highway**.

87.     At 1:19 p.m.  Hidalgo spoke with the unknown female who was coming to **855 American Legion Highway** to pick up the half (1/2) kilogram of cocaine that HIDALGO had purchased from Moises FIGUEROA. The unknown female stated she was driving a gold colored Altima. He instructed her to park in the parking lot of **855 American Legion Highway**.

88.     At 1:27 p.m.  Detective Brown reported that a tan Altima with a black female operating had just drove down American Legion Highway towards Cummings Highway.

89.     At 1:32 p.m. The unknown female contacted HIDALGO on Target Telephone #3 and stated that she was downstairs.

90.     At 1:35 p.m.   Detective Wright reported that HIDALGO and GOMES both exited the rear door of **855 American Legion Highway,** heading to the front of the building where Hidalgo's motor vehicle was parked. Detective Brown reported that Hidalgo was holding a brown bag in his hand. He approached the unknown females tan Altima bearing Massachusetts' registration # 771ME6 (Brown colored, 2002 Nissan Altima, registered to Darrell Smith, 37 Wolcott St Apt#2, Dorchester), which was parked on American Legion Highway and placed the brown bag inside of her vehicle. When HIDALGO stood back up he no longer had the brown bag in his hand. Both vehicles left the area of **855 American Legion Highway** and traveled in the same direction.

91.     At 1:45 p.m.- Detective Ismael Henriquez reported that the gold colored Altima bearing Massachusetts registration # 771ME6 had just pulled into the rear of 225 Blue Hill Avenue, former residential address of HIDALGO.

92.     At 1:49 p.m.   Detective Henriquez reported that HIDALGO'S motor vehicle bearing Massachusetts registration # 811SM3 had just pulled into the rear of 225 Blue Hill Avenue. The plant confirmed that the motor vehicle was at that location with the use of electronic surveillance. Detective Henriquez reported that the unknown female who was operating Massachusetts' registration # 771ME6 had just pulled out of the rear of 225 Blue Hill Avenue. As that vehicle was coming out Detective Brown positively identified the unknown female operator as Kendra Ward (DOB 4/18/88).

93.     I have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and found that Moises FIGUEROA lists **855 American Legion Highway** as his residential address on his Massachusetts' driver's license #59773038.   On numerous occasions Moises FIGUEROA has provided **855 American Legion Highway, Apartment 3C** as his residential address to Boston Police officers. Records from NSTAR (which provide electricity in the city of Boston) show that it provides service to **855 American Legion Highway, Apartment 3C, Roslindale**, and the subscriber is Iris FIGUEROA.

94.     Throughout the investigation agents have conducted controlled purchases of crack cocaine from FIGUEROA, intercepted electronic communications, and made observations that revealed that Moises FIGUEROA resides at **855 American Legion Highway, Apartment 3C**. On January 10th, 2013 at 2:34 p.m. surveillance units observed Moises FIGUEROA, walking with his daughter, enter **855 American Legion Highway**. On January 11, 2013 surveillance

units were able to enter the common hallway of **855 American Legion** and observe Moises

FIGUEROA open the door of **Apartment 3C**, with the use of a key.

95.     It is my opinion and the opinion of fellow law enforcement officers that Moises Figueroa

is residing at **855 American Legion Highway, Apartment #3C, Roslindale, Massachusetts,**

and that evidence if his drug distribution can be found there.

**F.      91 BARTON STREET, WELLESLEY HILLS, MA**

96.     On November 25, 2011 at approximately 12:00 p.m. a CW met with Agents with the

Federal Bureau of Investigation, Homeland Security Investigations and Officers and Detectives

with the Boston Police Department at a predetermined location. At approximately 12:06 p.m. the

CW placed a call to Moises Figueroa at telephone number (617) 407-0865. Figueroa answered

the call, and during the conversation Figueroa tells the CW "I'm on the block. We gotta take a

ride though my nigga, I totally, fuckin forgot." The CW asks Figueroa where they needed to

travel, and Figueroa says "my spzzot I got out there." Figueroa tells the CW that he is at Hendry

Street, and the CW tells Figueroa he will meet him there in ten or fifteen minutes before the call

ends.

97.     At approximately 12:12 p.m., the CW placed a call to Moises Figueroa at telephone

number (617) 407-0865. During the conversation, the CW asks Figueroa "Yo, you can't grab it

from homeboys over there and then hit them off later on? Or I gotta take that long ride with

you?" Figueroa replies "Well nah, because then, nobody gonna have, you know what I'm

sayin?" Figueroa says that the ride will take approximately twenty minutes, and the CW tells

Figueroa to wait until the CW arrives before the call ends.

98.     The CW and vehicle were searched and confirmed to be absent any currency or

contraband. The CW was given official money and recording equipment prior to departing for 37

Hendry Street in Dorchester, MA from the prearranged location. At approximately 12:37 p.m. Police Officer (PO) Monteiro observed the CW arrive at 37 Hendry Street and walk inside of the building. At approximately 12:40 p.m. PO Monteiro observed the CW and Figueroa walk out of 37 Hendry Street, and get into a red Honda bearing MA registration 123GB9. The CW was operating the vehicle, and Figueroa was seated in the passenger seat. The vehicle departed Hendry Street in Dorchester, and traveled west to route 9. The CW and Figueroa remained under mobile surveillance.

99.     At approximately 1:10 p.m. Detective Wright and PO Monteiro observed the CW and Figueroa's vehicle turn onto Barton Road from Cedar Street in Wellesley Hill, MA. Thereafter, Figueroa was observed with the CW, using a key to enter a residence on Barton Road. At approximately 1:15 p.m., the previously described red Honda was observes departing Barton Road onto Cedar Street, towards route 9. At approximately 1:55 p.m. the red Honda arrived back at 37 Hendry Street, the vehicle was parked. Shortly thereafter, the CW departed from 37 Hendry Street, and met Agents and Officers at a pre-determined location. The CW surrendered one tied plastic bag containing a white rock-like substance that had been purchased from Figueroa. This substance was submitted to the Drug Enforcement Laboratory for analysis, and the results were positive for the presence of cocaine.

100.    A review of the video footage gathered by the CW revealed that Figueroa used a key to enter **91 Barton Hills Road Wellesley Hills, MA**. Once inside of the home, Figueroa walked into a room in the apartment, and returned to the CW with a box in his hand. The CW handed Figueroa official money, and Figueroa handed the CW previously described plastic bag containing crack cocaine. Once this was completed, Figueroa returned to the room with the box, and came back to the CW before the two departed from the home.

101.    On November 9, 2012 at approximately 10:50 a.m. Hidalgo receives an incoming call on telephone number (617) 459-9789 from Moises Figueroa at telephone number (617) 407-0865. During the conversation, Hidalgo tells Figueroa "Uh, shit. Fuck it. [U/I] see you can put that together for me so I can go to the store." Figueroa says "Yes sir. You already know. What's the word?" Hidalgo replies "Shit. [UI] waiting on Cali. I'm about to get dressed and I'll leave. Where you at? [UI] school?" Figueroa responds "Huh? No, I'm over here. [UI] my other crib. Want to be out in the minute." Hidalgo tells Figueroa to contact him when he gets to the neighborhood, and the call ends shortly thereafter. Based upon my training, experience and knowledge of this investigation, I know that when Hidalgo tells subjects to "put that together" he is often referring to money that the subject owes to Hidalgo as a result of a drug debt. Moreover, Hidalgo often makes the statement that he wants to "go to the store", and uses this statement in conjunction with attempts to replenish his drug supply. On this occasion, I believe that Hidalgo is asking if Figueroa can get the money he owes Hidalgo together, so that Hidalgo can purchase a new drug supply. Lastly, Figueroa tells Hidalgo that he is at "his other crib". Based upon previously intercepted conversations between Hidalgo and Figueroa, I know that Figueroa always tells Hidalgo that he is "on the Leege" when he is present at **855 American Legion Highway**. Therefore, I believe that this statement is a reference to **91 Barton Hill Road in Wellesley Hills, MA**.

102.    On November 11, 2012 at approximately 5:34 p.m. Hidalgo uses telephone number (617) 459-9789 to contact Figueroa at telephone number (617) 407-0865. During the conversation Hidalgo asks Figueroa, "Mizzy, you still got bud left?" And Figueroa replies "Um, yeah." Hidalgo says "I got, I think somebody needs a seven." Figueroa responds "Nah, I gotta go grab it at the, out the crib." And Hidalgo asks "What out there?" Figueroa says "Yeah, definitely got it

out there." Hidalgo goes on to say "Fuck it then, let me call somebody else then." Figueroa asks

after Hidalgo's location, to which he replies that he just arrived at Woodward Avenue. Figueroa

asks "You telling me they don't got shit?" And Hidalgo replies "Nah, well there's a couple niggas

with bud, nobody's here though, everybody's out." Figueroa says "Oh alright, alright. I just um, I

got like about probably less than a um, probably got like two grizzy's on me if you wanna come

get that." And Hidalgo answers "Nah, I'ma, I'ma call DD cause DD should be almost here. I'ma

call (U/I). In my experience conducting investigations of individuals engaged in drug trafficking

activity, I have learned that drug traffickers go to great lengths to conceal locations wherein the

store drug supplies, related paraphernalia and proceeds from said activity. Based upon my

training, experience and knowledge of this investigation, I know that Hidalgo's statement

concerning "bud" and a "seven" are references to marijuana, and a seven gram quantity of

marijuana. On this occasion, I believe that Hidalgo is telling Figueroa that he has a transaction

lined up with a customer for seven grams of marijuana, and need Figueroa to provide the supply

because there is no supply on hand at Woodward Avenue. Moreover, believe Figueroa tells

Hidalgo that he has the supply, but needs to go out to his other home to obtain it, without

identifying where this home is located. Hidalgo, knowing the location of the home, declines

Figueroa, because he knows how long it will take to retrieve the marijuana supply. Lastly, I

believe this location to which Figueroa refers is **91 Barton Road Wellesley Hills, MA.**

103.    On December 20, 2012 at approximately 3:00 p.m. SA Knight conducted physical

surveillance in the area of **855 American Legion Highway Boston, MA.** At that time and

location, SA Knight observed Moises Figueroa walk from the side of the building to a parked,

later model Hinda Accord, dark gray color, which bore MA registration3MTF10. Figueroa

entered the car, and departed from the parking lot. According to a search of the Registry of Motor Vehicles database, the Honda Accord has the following listing:

2008 Honda Accord, black in color, two-doors,

VIN 1HGCS22828A004676

Registered owner: Cherri Latorella, DOB 12/31/1980,

Registered address 11 Hillis Road Hyde Park, MA 02136

104.    On January 13, 2013 the Honorable Robert Collings, United States District Court Magistrate Judge, District of Massachusetts, signed an order authorizing the the the collection of global positioning data for Moises Figueroa's telephone assigned number (617) 407-0865. A review of these records conducted on January 14, 2013 at approximately 11:00 p.m. through the morning of January 15, 2013 revealed that Figueroa's telephone global positioning data was within the immediate vicinity of **91 Barton Road Wellesley Hills, MA**. On January 15, 2013 at approximately 6:30 a.m. SA's Suelen and Kelly responded to the area of **91 Barton Road Wellesley Hills, MA** and observed Moises Figueroa's Honda Accord parked in the lot adjacent to **91 Barton Road**. Surveillance units subsequently observed Moises FIGUEROA exit 91 Barton Road, Wellesley.

**JOHN WEBBE**
**G.     567 MASSACHUSETTS AVENUE, APARTMENT A, BOSTON, MA**

105.    John WEBBE, date of birth July 27, 1977.  John WEBBE resides at **567 Massachusetts Avenue, Apartment A, Boston, Massachusetts**. WEBBE lives with girlfriend, Krystal Lopes, date of birth October 15, 1986. John WEBBE has recently relocated to this residence after being

evicted from 37 Hendry Street, Dorchester and has been intercepted on Target Telephone #5 continuing his drug distribution activities.

106.    I have reviewed the Massachusetts Board of Probation Criminal History Record for John WEBBE, date of birth July 27, 1977. A review of this record revealed that John WEBBE has the following convictions as an adult:

*Boston Federal Court:*

Distribute/Dispensing Class B, Cocaine Base

*State Court*:

Distribute/Dispensing Class B (Cocaine) 2ND Subsequent Offense

Distribution of Class B (Cocaine)

Possession with intent to Distribute, a Class B (Cocaine)

Possession with intent to Distribute, a Class D substance, Marijuana

Possession of a Class D substance (Marijuana) Subsequent Offense

Control Substance School

CONTROLLED PURCHASES

107.    On October 5, 2011 a CW conducted a controlled drug purchase from Alexis Hidalgo, Hamilton Lopes, John Webbe and Victor Scott at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 5.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

108.    On November 14, 2011 a CW conducted a controlled drug purchase from Moises Figueroa, John Webbe and Hamilton Lopes at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 29 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

109. On February 25, 2012 a CW conducted a controlled drug purchase from Alexis Hidalgo and John Webbe at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 30.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

110. On September 30, 2012 a CW conducted a controlled drug purchase from Joshua Brandao, John Webbe and Victor Scott in front of 5 Saxton Street in Dorchester, Massachusetts. The CW purchased approximately 7 grams of crack cocaine. The lab results sought for this substance are pending. The field test conducted was positive for the presence of cocaine.

## INTERCEPTED PHONE CALLS

111. On August 09, 2012 at 3:17 p.m. John Webbe called Alexis HIDALGO on Target Telephone #1. HIDALGO tells Webbe that Rel (Victor Scott) left money under the mattress. WEBBE tells HIDALGO he is not at the house yet (37 Hendry Street, Dorchester), at which time HIDALGO yells at WEBBE for being a sneak.

> **JOHN WEBBE**: Yo.
> **ALEXIS HIDALGO:** Yup where you at?
> **JOHN WEBBE:** Yeah, on the move.
> **ALEXIS HIDALGO:** Yeah, yeah, yeah, already at the house?
> **JOHN WEBBE:** I'll be there like in 5 minutes.
> **ALEXIS HIDALGO:** Nigga you aint there ya told me yous was leavin yous told me yous was coming back you didn't even come back dog you a lying ass nigga always on some sneaky shit dog. You fucking keeping it a hundred.
> **JOHN WEBBE:** Over there.
> **ALEXIS HIDALGO:** Nigga you say shit ya aight coming back nigga start keep it a hundred nigga don't fuck wit UI beat around the bush and try to slide out...
> **JOHN WEBBE:** I woke up an.
> **ALEXIS HIDALGO:** Yo I'll be I'll be hurry up an get to the house an grab this money this nigga left for me under the fucking mattress before you say something like somebody took it dog.
> **JOHN WEEBE:** Who?
> **ALEXIS HIDALGO:** "REL" left some money under your mattress dog.
> **JOHN WEBBE:** Oh, all right.

112.     On August 11, 2012 at 9:45 p.m. Alexis HIDALGO calls John WEBBE on Target

Telephone #1 and tells WEBBE that he has a drug customer coming by in fifteen minutes.

HIDALGO tells WEBBE to give him two O'S of the twerp (two ounces of crack).

> **JOHN WEBBE:** Yeah.
> **ALEXIS HIDALGO:** You at the house right? J
> **JOHN WEBBE:** Yeah.
> **ALEXIS HIDALGO:** My play is about to be there fifteen minutes, give him two O's of the Twerp . Two O's that's left.
> **JOHN WEBBE:** Two that's there ?
> **ALEXIS HIDALGO:** Yeah the white one and the brown one.
> **JOHN WEBBE:** Yeah........coughing......where you at Frank...

113.     On October 30, 2012 at 2:34 p.m. Alexis HIDALGO calls John WEBBE on Target

Telephone #3 and ask WEBBE how many zips (ounces) of crack are left.

> **ALEXIS HIDALGO:** Hello?
> **JOHN WEBBE:** Yo (coughs) yo.
> **ALEXIS HIDALGO:** How many zips over there?
> **JOHN WEBBE:** Think like three and a half.
> **ALEXIS HIDALGO:**You ain't got four of 'em?
> **JOHN WEBBE:** Ummm UI...bus down..
> **ALEXIS HIDALGO:** See if you got four of 'em I'm gonna send my man over there I'm gonna have him call your phone pick it up my nigga you all never pick up the phone nigga what the fuck nigga. You keep stashing your phone from home girl that's why you don't pick, nowhere you eat...Think your slick oh yeah. Then I gotta call her phone to get contact with you
> **JOHN WEBBE:** (phone breaks up)
> **ALEXIS HIDALGO:** Yo I'm gonna have dude call your phone right now just pick it up man; if it ain't four just give it what it is an fuck it.

114.     This investigation confirmed that John WEBBE was managing a drug distribution

center located at 37 Hendry Street, Dorchester. The foot traffic in and out of this location was

source of several complaints to not only the Boston Police Department, but also City Hall.

115.   Throughout this investigation surveillance has shown that WEBBE resides at **567 Massachusetts Avenue, Apartment A.**  Most recently on Wednesday January 10, 2013 at about 8:33 a.m. surveillance units observed WEBBE exit the area of the rear of **567 Massachusetts Avenue** get into his motor vehicle, Massachusetts registration #989HY7, and then drive around to the front of **567 Massachusetts Avenue**. WEBBE the exited the motor vehicle and entered the front, exterior door of **567 Massachusetts Avenue**, with the use of a key.

116.   An inquiry of the Massachusetts Registry of Motor Vehicle records and found that LOPES lists **567 Massachusetts Avenue, Apartment A, Boston,** as her residential address on her Massachusetts' driver's license #78825027. An inquiry to the United States Postal Service revealed that LOPES receives her mail at **567 Massachusetts Avenue, Apartment A.**  During this investigation surveillance revealed that WEBBE operates and owns Massachusetts registration #989HY7, a white, 1993 Honda Civic, registered to LOPES with an address of **567 Massachusetts Avenue, Apartment A, Boston.**

## VICTOR SCOTT
**H.     23 HAROLD STREET, APARTMENT #2, ROXBURY, MA**

117.   Victor Scott, date of birth June 06, 1989, **23 Harold Street, Apartment #2, Roxbury, Massachusetts.** Victor SCOTT is a twenty-three year old black male that resides at **23 Harold Street, Apartment #2, Roxbury,** with his girlfriend Oliviajoy Dancy. Victor Scott has recently relocated to this residence after being evicted from 37 Hendry Street, Dorchester, temporarily relocating to 5 Saxton Street, Dorchester, a residence from which he continued to distribute drugs. In September, 2012 the CW purchased a quantity of cocaine base from John Webbe and Victor Scott at 5 Saxton Street. As of December 13, 2012 Victor Scott moved to 23 Harold

Street, apartment #2, Dorchester. In the short period of time that Victor Scott has maintained residence here, he has been intercepted on Target Telephone #5 continuing his drug distribution activities.

118.    I have reviewed the Massachusetts Board of Probation Criminal History Record for Victor Scott. A review of this record revealed that Victor SCOTT has no adult convictions.

<u>CONTROLLED PURCHASES</u>

119.    On October 5, 2011 a CW conducted a controlled drug purchase from Alexis Hidalgo, Hamilton Lopes, John Webbe and Victor Scott at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 5.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

120.    On October 12, 2011 a CW conducted a controlled drug purchase from Alexis Hidalgo and Victor Scott at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 5.9 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

121.    On November 1, 2011 a CW conducted a controlled drug purchase from Moises Figueroa, Victor Scott and Nicholas Otey at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 24.8 grams of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

122.    On June 27, 2012 a CW conducted a controlled drug purchase from Alexis Hidalgo and Victor Scott at 37 Hendry Street in Dorchester, MA. The CW purchased approximately 28 grams

of crack cocaine. The lab results returned from testing the substance were positive for the presence of cocaine.

123. On September 30, 2012 a CW conducted a controlled drug purchase from Joshua Brandao, John Webbe and Victor Scott in front of 5 Saxton Street in Dorchester, MA. The CW purchased approximately 7 grams of crack cocaine. The lab results sought for this substance are pending. The field test conducted was positive for the presence of cocaine.

INTERCEPTED PHONE CALLS

124. On November 15, 2012 at 1:21 p.m. Victor SCOTT calls Alexis HIDALGO on Target Telephone #3. SCOTT asks if HIDALGO put that together (cooked cocaine into crack). HIDALGO says it's been together. SCOTT says he'll come grab it and has the money right now. HIDALGO says he's about to go to the other spot. SCOTT says he has four bands ($4,000). SCOTT says to put the one twenty-five together (125 grams of crack cocaine. HIDALGO says SCOTT has to go to Ruth's (Ruth Rivera-Lopes) house. SCOTT says he'll leave right now. HIDALGO says he'll meet SCOTT.

> **ALEXIS HIDALGO:** Yo.
> **VICTOR SCOTT:** What's the word?
> **ALEXIS HIDALGO:** What's the word dude?
> **VICTOR SCOTT:** You able to put that together.
> **ALEXIS HIDALGO:** S' been together I dunno what stopped gggg my shit didn't stop I don't know if your shit stopped my shit didn't stop....
> **VICTOR SCOTT:** Nah nigga, I been asked you to put that shit together for me I'll come grab it.
> **ALEXIS HIDALGO:** You asking me if I put something together nigga you know what what time it is nigga. Shit's always put together-nigga ,you's just bull shitting.
> **VICTOR SCOTT:** You um.
> **ALEXIS HIDALGO:** You're done, done all your Hollywood shit ?
> **VICTOR SCOTT:** Cut the shit.
> **ALEXIS HIDALGO:** Huh?
> **VICTOR SCOTT:** (U/I).

**ALEXIS HIDALGO:** You ready to get back, ready to get back to the picture.
**VICTOR SCOTT:** Been ready nigga fucking um. I got the money right now. Where you at? Blue Hill?
**ALEXIS HIDALGO:** I'm bout to go to the spot, I'm bout to go to ummm, I ain't been fuckin around over there I been at the other spot. Fucking what, what you put together?
**VICTOR SCOTT:** I got like four bands.
**ALEXIS HIDALGO:** Four bands, all right. So what's that you want me to give you a buck an a quarter you know you owe me four..
**VICTOR SCOTT:** Yeah nigga.
**ALEXIS HIDALGO:** Don't say yeah nigga, cause you don't act like you don't remember nigga, I gotta remind you all the time nigga.
**VICTOR SCOTT:** Nah forget it put the umm one twenty-five together.
**ALEXIS HIDALGO:** All right ...I got you...you ready?
**VICTOR SCOTT:** Ah g..g..yeah where am I meet you at.
**ALEXIS HIDALGO:** You gotta go to Blue Hill to Ruthie's house.
**VICTOR SCOTT:** Ruthie's ohh ohh ohh ummmm who Bonzie's?
**ALEXIS HIDALGO:** Bonzie's bitch.
**VICTOR SCOTT:** Ohh all right.
**ALEXIS HIDALGO:** When you going, you coming right now.
**VICTOR SCOTT:** Yes call me soon as you get there dog cause I'm, I'm ready right now ...aight I'm gonna leave right now then.
**ALEXIS HIDALGO:** All right go head I'm gonna meet you over there.
**VICTOR SCOTT:** She, she lives by Flames right? Like a little bit up.
**ALEXIS HIDALGO:** Flames...she live right there across the street from the gate.
**VICTOR SCOTT:** Yeah All right.
**ALEXIS HIDALGO:** All right.


125.    Surveillance was conducted at 495 Blue Hill Avenue (address of Ruth Rivera-Lopes) and

observed Ruth Rivera-Lopes exit 495 Blue Hill Ave, return to her motor vehicle, and leaves area.

At 2:13 p.m. Surveillance observed SCOTT exit 495 Blue Hill Avenue and leave the area.

126.    On November 21. 2013, at 2:12 p.m. Alexis HIDALGO calls Victor SCOTT calls Target

Telephone #3 tells SCOTT to put the money together that SCOTT owes HIDALGO so

HIDALGO can go to the store (re-up his supply of cocaine).

**VICTOR SCOTT:** Yo.
**ALEXIS HIDALGO:** Where you at?
**VICTOR SCOTT:** Over here, on Savin Hill.
**ALEXIS HIDALGO:** See if you can put that together later so I can go to the store dog, I just got some bud..
**VICTOR SCOTT:** All right.

**ALEXIS HIDALGO**: All right.

OBSERVATIONS OF VICTOR SCOTT
AT 23 HAROLD STREET, APARTMENT #2, ROXBURY, MA

127.    Surveillance as of December 13, 2012 has identified **23 Harold Street, Apartment #2, Roxbury** as SCOTT'S current residence. Since December 13, 2012 surveillance has observed SCOTT entering and exiting **23 Harold Street** numerous times. Surveillance units have also observed SCOTT'S motor vehicle, Massachusetts registration #937RH5, a 2005 Infiniti FX35, parked unattended on Harold Street, on numerous occasions. On January 09, 2013 surveillance units observed Victor SCOTT, inside of **23 Harold Street, Apartment #2, Roxbury**. Most recently on January 11, 2013 surveillance units observed SCOTT exit **23 Harold Street**, walked to his motor vehicle, remove a green, Celtics hat, and then walk back to **23 Harold Street**, and enter through the front, right, exterior door.

**JERRY CORREIA**

**I.    83 NELSON STREET, APARTMENT #1, MATTAPAN, MA**

128.    Jerry CORREIA, date of birth June 29, 1986, **83 Nelson Street, Apartment #1, Dorchester, MA**. On December 01, 2012 officers responded to 36 Woodward Avenue for a call of "Shots fired". As a result of this call officers conducted a protective sweep of this residence and located multiple firearms, marijuana, tablets believed to be oxycodone, and drug packaging materials. As a result of this discovery Jerry Correia who used this location to distribute drugs on behalf of the organization, then deemed 36 Woodward Avenue "Hot" and moved their drug distribution network from this location to conducting in person deliveries. I have reviewed numerous intercepts occurring over Target Telephone #5 where I have heard Jonathan Dasilva drug customers to Jerry Correia's residence at 83 Nelson Street, Dorchester, to purchase narcotics. Based on those intercepted conversations, surveillance units have made observations

of customers arriving at 83 Nelson Street, and leaving seconds later. This behavior is consistent with behavior of drug customers, based on my training and experience as well as my knowledge of this investigation.

129.   I have reviewed the Massachusetts Board of Probation Criminal History Record for Jerry CORREIA who has the following adult convictions:

Possession to Distribute Class B (Cocaine)

Unlawful Possession of a Firearm

Carrying a Loaded Firearm

### CONTROLLED PURCHASES

130.   On August 3, 2011 a CW conducted a controlled drug purchase from Jonathan Dasilva, Benjamin Baptista, and Jerry Correia in front of 36 Woodward Avenue Roxbury, MA. The CW purchases approximately 55 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

131.   On January 17, 2012 a CW conducted a controlled drug purchase from Jerry Correia in front of 36 Woodward Avenue in Roxbury, MA. The CW purchased approximately 28.6 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

132.   On March 3, 2012 a CW conducted a controlled drug purchase from Jerry Correia, Jeremiah Barbosa, and Marcus Dasilva in front of 40 Langdon Street in Roxbury, MA. The CW purchased approximately 28.7 grams of marijuana. The lab results returned from testing the substance were positive for the presence of marijuana.

133.   On March 15, 2012 a CW conducted a controlled drug purchase from Jerry Correia,

Anthony Dasilva and Marcus Dasilva inside of 40 Langdon Street in Roxbury, MA. The CW

purchased approximately 27.9 grams of marijuana. The lab results returned from testing the

substance were positive for the presence of marijuana.

134.   On March 29, 2012 a CW conducted a controlled drug purchase from Jerry Correia and

Jeremiah Barbosa in front of 36 Woodward Avenue in Roxbury, MA. The CW purchased

approximately 28.3 grams of marijuana. The lab results returned from testing the substance were

positive for the presence of marijuana.

135.   On April 4, 2012 a CW conducted a controlled drug purchase from Jerry Correia in front

of 36 Woodward Avenue in Roxbury, MA. The CW purchased approximately 28.5 grams of

marijuana. The lab results returned from testing the substance were positive for the presence of

marijuana.

## INTERCEPTED PHONE CALLS

136.   On October 30, 2012 units conducted surveillance of Jerry CORREIA. On this day

Alexis HIDALGO has Jerry CORREIA and O'Niel TAYLOR cook crack for him, and distribute

the crack. The following is an excerpt from the surveillance report on this day:

**Call #10206** @ 12:25 PM- HIDALGO calls O'Niel TAYLOR and asks him to put product

together for him. TAYLOR tells HIDALGO, don't talk on the phone just make it happen.

**Call #10207** @ 12:25 PM- HIDALGO calls Ruth Rivera-Lopes and the two talk about TAYLOR

picking up keys to her apartment from her at Boost Mobile, Mattapan Square.

**Call #10210** @ 12:29 PM- Jerry CORREIA calls HIDALGO. HIDALGO asks CORREIA to do him a favor and pick up O'Niel TAYLOR, bring TAYLOR to Ruth's work so he grab keys, so TAYLOR can put together something for the Maine guys.

**Call #10212** @ 12:30 PM- HIDALGO calls TAYLOR and tells him to get the keys from Ruth (Ruth Rivera-Lopes who allows her residence, 495 Blue Hill Avenue to be used as a drug distribution center) at the Boost Mobile Store in Mattapan Square. HIDALGO tells TAYLOR that the cocaine isn't that great so "make it happen".

**2:00 PM-** Surveillance reports that CORREIA has arrived in the area of 495 Blue Hill Avenue, operating Massachusetts registration #122PS6, a 2013, black, Buick Lacrosse.

**2:02 PM-** Surveillance reports that CORREIA and TAYLOR have exited the motor vehicle and are walking towards 495 Blue Hill Avenue. Surveillance reports that CORREIA is wearing a black hooded sweatshirt and TAYLOR is dressed all in black, with a print on the t-shirt. Surveillance reports that both parties approach 495 Blue Hill Avenue and that CORREIA has keys in his hand and is opening the front exterior door at that address.

**Call #10250** @ 2:12 PM- Morris ROBINSON calls HIDALGO and HIDALGO tells ROBINSON to bring his change (money) to his man.

**Call #10252** @ 2:13 PM- CORREIA calls HIDALGO and HIDALGO tells CORREIA that the stuff is on the fridge and that his man is coming through for 125 grams of cocaine.

**Call # 10288** @ 3:03 PM - HIDALGO calls CORREIA and says that the "Player" for the 125 grams (125 grams of crack) will be there in 5 minutes. The customer is Morris ROBINSON. Meet will be at 495 Blue Hill Avenue.

**Call # 10298** @ 3:32 PM - Maurice ROBINSON calls HIDALGO and states that he is on his way and that  he will call when he is outside 495 Blue Hill Avenue.

**Call # 10304** @ 3:51 PM – HIDALGO calls Maurice ROBINSON and ROBINSON states that he will be there (495 Blue Hill Avenue) in 5 minutes.

**Call # 10305** @ 3:52 PM – HIDALGO calls CORREIA and tells him the 125 "Player" (ROBINSON) is about to arrive and to also give him the "Dubee" (62 grams of crack) that is already done (cooked) and that he (ROBINSON) owes him "TWO".

**Call # 10306** @ 4:01 PM - Maurice ROBINSON calls HIDALGO and says that he is at the lights.

**4:03 PM** – Surveillance reports that a red Toyota Corolla (764TC5) just pulled up in front of 495 Blue Hill Avenue and a black male wearing blue jeans and black hoodie exits. Surveillance confirms black male to be Maurice ROBINSON and that ROBINSON enters 495 Blue Hill Avenue.

**4:05 PM** - V859 reports that Maurice ROBINSON exits 495 Blue Hill Avenue and enters the red Toyota (764TC5) and the vehicle drives away outbound on Blue Hill Avenue. Surveillance confirms ROBINSON to be wearing blue jeans, a black Champion sweatshirt, gray hat and white sneakers holding something in his waist area.

**4:23 PM** – Surveillance reports that CORREIA and TAYLOR exit 495 Blue Hill Avenue and walk toward the vehicle. Surveillance reports that TAYLOR'S left sweater pocket is moving back and forth as if something heavy is inside the pocket. Both enter the black Buick (Massachusetts' registration #122PS6) and leave the area.

137. On November 21, 2012 at 7:50 p.m. Alexis HIDALGO calls Jerry CORREIA on Target Telephone #3. HIDALGO tells CORREIA that Jose DENIS in front of the gate (36 Woodward Avenue). DENIIS had ordered 200 Percocet 30 tablets from HIDALGO. HIDALGO had CORREIA fill the order for DENIS. (see phone call with DENIS ordering the tablets below).

**JERRY CORREIA**: Yo.

**ALEXIS HIDALGO**: He's in front of the gate dude.

**JERRY CORREIA**: All right.

**ALEXIS HIDALGO**: All right.


138.    On November 21, 2012 at 10:29 p.m. Jonathan DASILVA calls Jerry CORREIA and tells

CORREIA to give an unknown male 100 Percocet 30 tablets.

139.    On September 29, 2012 at 4:05 p.m. a telephone call was intercepted on Target

Telephone #5. The participants were Jonathan DASILVA and Jerry CORREIA. During the

conversation Jerry CORREIA, informed Jonathan DASILVA that he collected twelve-three

($12,300) from Lino CORREIA a/k/a "L" a/k/a "HAJJ", and seven-six ($7,600) from an

unknown male "JOEY". Jerry CORREIA then tells Jonathan DASILVA that he has given twenty

($20,000) to Jonathan DASILVA'S mother.

> **JERRY CORREIA**: Yo.
> **JONATHAN DASILVA**: Yo.
> **JERRY CORREIA**: I just gave your moms U/I dollars of off twenty.
> **JONATHAN DASILVA**: Huh?
> **JERRY CORREIA**: I gave your mom's twenty.
> **JONATHAN DASILVA**: You gave it to my moms?
> **JERRY CORREIA**: Yeah.
> **JONATHAN DASILVA**: From who? From L?
> **JERRY CORREIA**: From L and JOEY.
> **JONATHAN DASILVA**: Joey cashed you for the four?
> **JERRY CORREIA**: Yeah.
> **JONATHAN DASILVA**: What he gave you?
> **JERRY CORREIA**: Um… Seven- six.
> **JONATHAN DASILVA**: Huh!
> **JERRY CORREIA**: Seven, Seven,-six!
> **JONATHAN DASILVA**: Seven-six?
> **JERRY CORREIA**: Yeah, and Hajj gave me twelve-three… For six and half to pay for (U/I).
> **JONATHAN DASILVA**: All right.
> **JERRY CORREIA**: All right.
> **JONATHAN DASILVA**: Later.

140.    The following is an excerpt of a surveillance report on September 29, 2012 in relation to the above intercepted phone call. Surveillance units observed Jerry CORREIA arrive at 40 Langdon Street, Roxbury, Massachusetts.

4:01 p.m.- Surveillance reported that **Massachusetts Registration 782SC5,** 2012 Chevrolet Traverse, maroon, EAN Holdings (Rental), was leaving Woodward Avenue. This vehicle contained four individuals. This vehicle drove around the block and parked on the left side of Langdon Street at George Street.

4:03 p.m.-Surveillance reported that Jerry CORREIA, exited that Traverse and entered 40 Langdon Street.

4:05 p.m.-Surveillance reported that Jerry CORREIA exited the house, reentered the Traverse, and drove away.

OBSERVATIONS OF JERRY CORREIA

AT 83 NELSON STREET, APARTMENT #1, MATTAPAN, MA

141.    Throughout this investigation surveillance has shown that CORREIA resides at 83 Nelson Street, apartment #1, Dorchester.

142.    Most recently on January 04, 2013 surveillance units followed Jerry Correia from the area Suffolk Superior Court, Boston to **83 Nelson Street, Dorchester.**

143.    I have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and found that Jerry CORREIA provides 83 Nelson Street, apartment #1, as his residential address on his Massachusetts' driver's license #S95864948.

144.    I have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and found that CORREIA'S motor vehicle, Massachusetts registration #32TE77, a 2007 Nissan Maxima is registered to CORREIA at 83 Nelson Street, apartment #1, Dorchester.

145.    I have conducted a query through the Criminal Justice Information Systems (CJIS), which revealed that CORREIA, who is currently on probation, provides 83 Nelson Street, apartment #1, Dorchester as his residential address on his Board of Probation Records and to Probation.

146.    The City of Boston's Assessing Department lists 83 Nelson Street, Dorchester as a three family. It also lists Maria Silva as the owner.

## JOSE DENIS
## J.        22 ARMANDINE STREET, APARTMENT #1, DORCHESTER, MA

147.    Jose Denis, date of birth August 19, 1976, **22 Armandine Street, Apartment #1, Dorchester, Massachusetts.**  I believe, based on the quantity of drugs and frequency of drugs purchased by DENIS that he re-distributes drugs to customers.  I have intercepted at least one telephone conversation with Alexis Hidalgo where DENIS directs Hidalgo to "Armandine" so that they can conduct drug related business.

148.    I have reviewed the Massachusetts Board of Probation Criminal History Record for Jose Denis, date of birth August 19, 1976. A review of this record revealed that Jose DENIS has no adult convictions.

## INTERCEPTED PHONE CALLS

149.    On September 27, 2012 at 1:44 p.m. Alexis HIDALGO called Jose DENIS on Target Telephone #3. DENIS asks HIDALGO if could give HIDALGO $8000.00 and if HIALGO could cuff him nine (9) ounces of crack. HIDALGO stated he was going to cuff DENIS anyways and asked him to just come on because he wanted to get everything done so he can get his hair braided.

> **JOSE DENIS**: Yo.
> **ALEXIS HIDALGO:**  Yeah, how long you talking?

**JOSE DENIS:** Yeah bro.

**ALEXIS HIDALGO:** You heard me?

**JOSE DENIS:** Nah I didn't hear you. What'd you say?

**ALEXIS HIDALGO:** I said how long you talking?

**JOSE DENIS:** Not long. I'm talking like in a few minutes, but I was gonna, I need a favor bro.

**ALEXIS HIDALGO:** What happened?

**JOSE DENIS:** Nah, I'm just sayin bro, we, you dipping like, for like a week or somethin bro?

**ALEXIS HIDALGO:** No, I'll be back on Monday.

**JOSE DENIS:** Oh, nah. Cause I was gonna say, I'll give you like eight. I'll give you eight, and just cuff me the mizzy bro.

**ALEXIS HIDALGO:** I just, come on, I got, I was gonna, I was gonna hit you off with something, just come on, I got you bro. I'm tryin to get all this shit out the way dude. Cause I gotta get a line-up and my hair braided and all that shit. JD – All right, I got you I'm about to go to the crib and see you in a minute.

**ALEXIS HIDALGO:** All right.

## OBSERVATIONS OF JOSE DENIS
### AT 22 ARMANDINE STREET, APARTMENT #1, DORCHESTER, MA

150.    Throughout this investigations Jose DENIS has purchased large quantities of crack cocaine. DENIS has also purchased oxycodone from HIDALGO, and supplied HIDALGO with marijuana.

151.    Throughout this investigation surveillance has shown that DENIS resides at **22 Armandine Street, Apartment #1, Dorchester**. On December 29, 2012, at approximately 2:01 pm, surveillance units observed DENIS exit **22 Armandine Street** and leave the area in his Suburban.

152.    I have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and found that DENIS provides **22 Armandine Street, Apartment #1,** as his residential address on his Massachusetts' driver's license #S75172114.  I have conducted an inquiry of the Massachusetts Registry of Motor Vehicle records and found that DENIS has two motor vehicles: Massachusetts registration #895RL3, a purple, 2001 Chrysler PT Cruiser, and Massachusetts

registration #4DL940, a black, 1999 Chevy Suburban registered to DENIS at **22 Armandine Street, Apartment #1, Dorchester**.

153. Throughout this investigation Jose DENIS' surveillance units have observed Jose DENIS' motor vehicle parked in front of 22 Armandine Street, Dorchester.

## THE REQUEST FOR SEARCH WARRANT
## FOR THE TARGET PREMISES

154.    Based on the foregoing, there is probable cause to believe that the Target Subjects are engaged in the distribution of cocaine, cocaine base, oxycodone and marijuana who has been residing at the Target Premises and/or using the Target Premises to store drugs, drug proceeds, and other items associated with drug trafficking. Based on my training and experience, as well as conversations with other law enforcement officers I work with, I am aware that it is generally a common practice for individuals who distribute controlled substances to maintain large quantities of controlled substances in their residences, and at times, in hidden compartments inside their residences and vehicles so that they can run their drug trafficking business and avoid ready detection.

155.    Based upon my training and experience, as well as my conversations with other law enforcement agents I have worked with, I am also aware that it is generally a common practice for individuals who distribute controlled substances to maintain in their residences records relating to their drug trafficking activities. Even lower level distributors are often "fronted" drugs from their suppliers and will need to keep track of amounts paid and owed. Although such records are likely to be maintained close at hand so as to readily ascertain current balances, they are usually hidden so as to avoid ready detection. They are therefore likely to be located anywhere within a trafficker's residence.

156. Based upon my training and experience, I am further aware that it is a common practice for distributors of controlled substances to conceal at their residences sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug distribution would also typically be maintained in residences.

157. As in this case, individuals who distribute controlled substances often stay in contact with their customers and suppliers using cellular telephone equipment. Bills and other documents relating to the usage of such equipment and the information which is frequently stored within it (such as telephone listings of clients and suppliers, speed dialing features and voice mail) are also likely to be present in a trafficker's residence and will confirm prior contacts with suppliers and customers. Here, that equipment is likely to be anywhere inside the Target Premises.

158. During the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject Premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

159. My awareness of these drug distribution practices, as well as my knowledge of the drug use and distribution techniques as set forth in this Affidavit, arise from my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; my involvement on a number of occasions in debriefing confidential

informants and cooperating individuals in prior drug investigations, as well as what other law

enforcement agents and officers have advised me when relating the substance of their similar

debriefings and the results of their own drug investigations; and other information provided

through law enforcement channels.

## ITEMS TO BE SEIZED

160.    Based upon all of the information I have obtained during the course of this investigation,

and for the reasons more specifically set forth above, I submit that there is probable cause to

believe that: 1) Jonathan DASILVA has used 252 KENNEDY DRIVE, APARTMENT #605,

MALDEN, MA and 40 LANGDON STREET, APARTMENT #1, ROXBURY MA; 2) Alexis

HIDALGO has used 500 BROADWAY STREET, APARTMENT #3161, MALDEN, MA and

220 PEARL STREET, APARTMENT #2, SOMERVILLE, MA; 3) Moises FIGUEROA has

used 855 AMERICAN LEGION HIGHWAY, APARTMENT #3C, ROSLINDALE, MA and 91

BARTON ROAD, WELLESLEY HILLS, MA; 4) John WEBBE has used 567

MASSACHUSETTS AVENUE, APARTMENT A, BOSTON, MA; 5) Victor SCOTT has used

23 HAROLD STREET, APARTMENT #2, ROXBURY, MA; 6) Jerry CORREIA has used 83

NELSON STREET, APARTMENT #1, MATTAPAN, MA; and 7) Jose DENIS has used 22

ARMANDINE STREET, APARTMENT #1, DORCHESTER, MA   in furtherance of their drug

distribution activities, and that evidence regarding those illegal drug activities will be found in

the respective Target Premises, including, but not limited to, additional drugs, baggies, scales,

U.S. currency, evidence of drug distribution to his customers, and evidence of his contacts and

purchases from suppliers.  More specifically, I submit that there is probable cause to believe that

the following items of evidence will be found in the Target Premises:

1.      Marijuana, cocaine, cocaine base, and/or oxycodone, baggies,
        scales, books, records, notes, ledgers, and any other papers or

records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of controlled substances, and/or records or electronic devices reflecting the identity of co-conspirators and drug customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and supporting paperwork, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, hotel receipts, meal receipts, travel agency vouchers, travel schedules, shipment records, telephone bills and/or toll records and bills.

2.     Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto. Such items include, but are not limited to jewelry, precious metals, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

3.     Documents reflecting dominion and/or control of the respective Target Premises including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

4.     Documents or tangible evidence reflecting dominion, ownership, and/or control by the respective Target Subjects over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.     Photographs of individuals, property, and/or illegal controlled substances relevant to the drug conspiracy and/or drug distribution charges.

161.   I therefore request the authority of this court to search the Target Premises, 252

KENNEDY DRIVE, APARTMENT #605, MALDEN, MA, 40 LANGDON STREET,

APARTMENT #1, ROXBURY MA, 500 BROADWAY STREET, APARTMENT #3161,

MALDEN, MA, 220 PEARL STREET, APARTMENT #2, SOMERVILLE, MA, 855

AMERICAN LEGION HIGHWAY, APARTMENT #3C, ROSLINDALE, MA, 91 BARTON

ROAD, WELLESLEY HILLS, MA, 567 MASSACHUSETTS AVENUE, APARTMENT A,

BOSTON, MA, 23 HAROLD STREET, APARTMENT #2, ROXBURY, MA, 83 NELSON

STREET, APARTMENT #1, MATTAPAN, MA, 22 ARMANDINE STREET, APARTMENT

#1, DORCHESTER, MA and any common hallways and/or common basement areas of the

Target Premises.

Signed under the pain and penalties of perjury this 16th day of January 2013.

Martin M. O'Malley,
Task Force Officer, FBI

Sworn and subscribed to before me this 16th day of January 2013, at           .

HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGF
United States District Court
John Joseph Moakley United States Courthou:
1 Courthouse Way, Suite 7420
Boston, Massachusetts 02210